UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE:  DEEPWATER HORIZON
BELO CASES

Case No. 3:19cv963-MCR-HTC

*This Order Relates to:*

**Lester Jenkins, 5:19cv260**
**Dwight Siples, 5:19cv310**
**Kenneth Davenport, 5:18cv245**
**Michael Moulder, 5:19cv12**
_____/

<u>ORDER</u> and
<u>REPORT AND RECOMMENDATION</u>

Plaintiffs, represented by the Downs Law Group, P.A., in this second group

of test cases, were clean-up workers hired to assist with the aftermath of the

Deepwater Horizon oil spill.  Plaintiffs sue Defendants BP Exploration and

Production, Inc., and BP America Production Co. (collectively "BP") for chronic

sinusitis and ocular disease,[1] which were diagnosed years after the spill occurred,

and which they contend were caused by exposure to the chemicals in the weathered

oil or the dispersants used as part of the clean-up efforts.  To succeed on their claims,

Plaintiffs must show, through expert testimony, that a chemical or mixture of

---

[1] Plaintiffs Davenport and Moulder complain of ocular conditions, namely, Keratoconjunctivitis
Sicca and Chronic Eye Irritation/Chronic Conjunctivitis, respectively.  Plaintiffs Jenkins and
Siples complain of a sinus condition, Chronic Sinusitis.

chemicals related to the oil spill caused their complained of medical conditions.  To do this, Plaintiffs must establish both general causation and specific causation.  The question before the Court today, however, is *solely* whether Plaintiffs have met their burden for general causation, at least sufficiently to send the question to the jury, and proceed to specific causation.

Pending before the Court are BP's motions to exclude Plaintiffs' general causation experts,[2] Dr. Ranajit Sahu, ECF Doc. 459; Dr. Gina Solomon, ECF Doc. 466; Dr. David Carpenter, ECF Doc. 468, and Dr. Michael Freeman, ECF Doc. 469, and BP's related motion for summary judgment, ECF Doc. 470.  Upon careful consideration of the evidence presented, after extensive briefing, and following an all-day hearing, the undersigned finds BP's motions to exclude should be GRANTED and the motion for summary judgment should be GRANTED.

---

[2] At oral argument, Plaintiffs withdrew the expert opinions of Dr. James J.J. Clark for general causation.  Thus, BP's motion to exclude Dr. Clark, ECF Doc. 460, and related motion to strike Dr. Clark's supplemental declaration, ECF Doc. 525, need not be addressed.  The clerk will be directed to terminate those motions as MOOT.  Additionally, Plaintiffs designated two diagnosis experts, Dr. Robert Cykiert and Dr. David Greene.  Dr. Cykiert diagnosed Plaintiffs Davenport and Moulder with ocular conditions and Dr. Greene diagnosed Jenkins and Siples with chronic sinusitis.  Although Plaintiffs initially identified these experts as offering opinions on diagnosis and general causation, Plaintiffs clarified at the hearing that they are not designating either expert for general causation.  Also, at the hearing, BP clarified they do not contest the qualifications of these experts to provide a diagnosis but dispute the method they used to do so.  *See* BP's *Daubert* motions, ECF Doc. 462 (Dr. Cykiert) and ECF Doc. 467 (Dr. Greene).  Given the undersigned's finding that the general causation experts should be excluded, the undersigned finds it unnecessary to address the motions to exclude the diagnoses experts.  Thus, the clerk will also be directed to terminate the Greene and Cykiert motions as MOOT.

The undersigned does not write this Report and Recommendation on a blank slate. The Eleventh Circuit, this Court, and the courts in the Eastern District of Louisiana (which have addressed similar issues in over 100 Deepwater Horizon cases) have discussed at length the minimal requirements an expert's opinion must meet to pass *Daubert*[3] muster on general causation in toxic tort cases. Notably, this Court granted summary judgment in favor of BP in the First Trial Pool Cases,[4] after excluding general causation expert Dr. Patricia Williams, and in doing so, issued a 58-page opinion (hereinafter referenced as the "Williams Order") detailing the shortfalls with Dr. Williams' opinions. *See In re Deepwater Horizon Belo Cases*, No. 3:19cv963, 2020 WL 6689212, at *12 (N.D. Fla. Nov. 4, 2020), *aff'd sub nom.*, *In re Deepwater Horizon BELO Cases*, No. 20-14544, 2022 WL 104243 (11th Cir. Jan. 11, 2022).[5]

Plaintiffs' experts in this second group of test cases have failed to cure the same "analytical gaps" that plagued Dr. Williams' opinions. Specifically, Plaintiffs' general causation experts (1) do not identify a statistically significant association in relevant epidemiological studies between any chemical or mixture of chemicals in the weathered oil or dispersants and the LMPCs at issue; (2) do not meaningfully

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).
[4] The First Trial Pool Cases consisted of 26 cases, represented by the Falcon firm and the Downs firm. *In re Deepwater Horizon BELO Cases*, 2020 WL 6689212, at *6.
[5] The Williams Order can also be found at ECF Doc. 97.

critique the strengths and weaknesses of the epidemiological studies on which they rely; (3) do not engage in a more than superficial analysis of the Bradford Hill factors; and (4) do not identify a harmful level at which any chemical or mixture of chemicals can cause Plaintiffs' LMPCs. While Plaintiffs attribute these failures to the lack of, or skewed, data collected by BP in the months after the oil spill, the reality appears to be that the science simply is not there to support Plaintiffs' claims. As the Southern District of Florida recently stated in the Zantac MDL litigation, "[a] common refrain in *Daubert* jurisprudence is that 'law lags science,' because the courtroom is not the appropriate forum for new scientific methodologies and theories to be tested; laboratories and published journals are the appropriate forum." *In Re: Zantac (Ranitidine) Products Liability Litigation*, 2022 WL 17480906, at *3–4 (S.D. Fla. Dec. 6, 2022) (granting *Daubert* motions on all general causation experts because "there is no scientist outside this litigation who concluded ranitidine causes cancer, and the Plaintiffs' scientists within this litigation systemically utilized unreliable methodologies with a lack of documentation on how experiments were conducted, a lack of substantiation for analytical leaps, a lack of statistically significant data, and a lack of internally consistent, objective, science-based standards for the evenhanded evaluation of data").

## I.    BACKGROUND[6]

On April 20, 2010, a massive and unprecedented oil spill occurred in the Gulf of Mexico when the Deepwater Horizon mobile offshore oil-drilling rig located approximately 125 miles offshore of Florida exploded.   During the months immediately following the explosion, over 90,000 people and 7,000 vessels were employed to address the Deepwater Horizon oil spill ("DWH Spill").  The incident resulted in thousands of claims being filed against BP, which were all originally consolidated in the Eastern District of Louisiana as part of the Deepwater Horizon multidistrict litigation (MDL No. 2179).  The MDL court approved a comprehensive Medical Benefits Class Action Settlement Agreement ("Settlement Agreement") for personal injury plaintiffs.  The Settlement Agreement provided a claims process for eligible class members who were diagnosed with a specified physical condition on or before April 16, 2012, and a separate litigation option for those seeking compensation for "Later-Manifested Physical Conditions" ("LMPCs"), defined as a physical condition diagnosed after the April 2012 cutoff date.[7]

Over 500 BELO cases have been filed in, or transferred to, this District by plaintiffs claiming LMPCs.  The Court consolidated those cases into this master

---

[6] The Williams Order contains a detailed discussion of the background of this litigation, the DWH Spill, response and data collection, and a discussion of the makeup and constituents of crude oil and dispersants.

[7] This separate litigation of claims is known as the "Back End Litigation Option" ("BELO").

action.  The Court initially selected the First Trial Pool Cases for discovery and stayed the remaining cases.  The discovery was bifurcated between general causation and specific causation.[8]   Plaintiffs designated Patricia Williams, Ph.D., a toxicologist, as their sole general causation expert.  BP moved to exclude Dr. Williams under *Daubert*, arguing her opinions were unreliable and unhelpful, and also moved for summary judgment.  "After carefully reviewing Dr. Williams's reports and her deposition testimony," the Court agreed with BP and found her opinions fell "woefully short of the *Daubert* and Rule 702 standards" because Dr. Williams: (1) failed to identify relevant statistically significant associations in the epidemiologic literature; and (2) failed to provide anything more than a conclusory analysis of the Bradford Hill factors to explain her opinions.  *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *12.  The Court also found Dr. Williams's opinions to be unhelpful because she failed to consider available exposure data for the relevant geographical area.  *Id.*  The Court, thus, entered judgment in favor of BP.  *Id.* at 17.

After the First Trial Pool Cases were dismissed, the Court proceeded to select a second group of test cases for discovery.  On September 30, 2021, the Court

---

[8] Bifurcation promotes judicial efficiency, particularly in mass toxic tort cases, because if plaintiffs are unable to establish general causation, the Court need not address specific causation.  *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) ("Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence.").

entered an Order setting four ocular and four sinus test cases on a discovery schedule. *See* ECF Doc. 342, Corrected Amended and Revised Case Management Order ("CARCMO"). Plaintiffs, represented by the Falcon/Lindsay firms and the Downs firm, selected two of the ocular cases and two of the sinus cases, and BP selected two of the ocular cases and two of the sinus cases. *See* ECF Doc. 348 (identifying the test cases). Unlike the plaintiffs in the First Trial Pool Cases, the Falcon Group Plaintiffs and the Downs Group Plaintiffs in this second group designated different experts. As set forth in the CARCMO, "if the *Daubert* or dispositive motions are decided adversely to the test plaintiffs, then all remaining BELO plaintiffs with similar LMPCs in the respective Falcon/Lindsay cases or in the Downs Law Group cases will be bound by the Court's rulings—after appeal, if any—and their cases will be dismissed with prejudice and without further litigation." ECF Doc. 342 at 5 (discussing preclusive effect of *Daubert* rulings).

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.") (emphasis in

original).  The moving party bears the burden of establishing that there is no genuine dispute of fact and that the plaintiff has failed to establish an essential element of the claim.  *See Allen v. Bd. of Pub. Educ*., 495 F.3d 1306, 1313 (11th Cir. 2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  To avoid summary judgment, the nonmoving party must then go beyond the pleadings and "designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  However, summary judgment cannot be avoided through evidence that is "inadmissible at trial."  *Chapman v. Procter & Gamble Distrib.*, *LLC*, 766 F.3d 1296, 1313 (11th Cir. 2014) (quoting *Corwin v. Walt Disney Co*., 475 F.3d 1239, 1249 (11th Cir. 2007)).

### B. 702 and *Daubert*

In a toxic tort case, such as this, a plaintiff must establish both general and specific causation through admissible, reliable expert testimony.  *McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233, 1239 (11th Cir. 2005).  Under Federal Rule of Evidence 702, expert testimony regarding scientific, technical, or other specialized knowledge is admissible if it is: (1) helpful to the jury, (2) based on sufficient facts or data, (3) the product of reliable principles and methods, and (4) demonstrates that "the expert has reliably applied the principles and methods to the facts of the case." The Eleventh Circuit has distilled the Rule 702 requirements into three inquiries: (1) whether the expert is qualified; (2) whether "the methodology by which the expert

reaches [a] conclusion[] is sufficiently reliable" under the principles of *Daubert*; and (3) whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue through the application of scientific, technical, or other specialized knowledge. *Rink v. Cheminova, Inc*., 400 F.3d 1286, 1291–92 (11th Cir. 2005).

Reliability under *Daubert* is determined by considering: (1) whether the expert's methodology can or has been tested; (2) whether the scientific technique or theory has been subjected to peer review and publication; (3) whether there is a known rate of error for the method; and (4) whether the technique is generally accepted in the scientific community. *See* 509 U.S. at 593–94; *Rink*, 400 F.3d at 1292. The court considers "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *Daubert*, 509 U.S. at 592–93) (internal quotation marks and alteration omitted).

The helpfulness prong of Rule 702 is concerned with ensuring that expert testimony is not only scientifically reliable but also "relevant to the task at hand." *Daubert*, 509 U.S. at 597. Under *Daubert* the court's role as a "gatekeeper" is to ensure expert testimony is admitted only if it is reliable *and* relevant. *Id.* at 589, 597. The party offering the expert testimony has the burden to establish "these

basic requirements——qualification, reliability, and helpfulness." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

Under *Daubert*, the court's role as a "gatekeeper" is to ensure expert testimony is admitted only if it is reliable *and* relevant. *Id.* at 589, 597. The party offering the expert testimony has the burden to establish "these basic requirements––qualification, reliability and helpfulness." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

## III.   GENERAL CAUSATION

There are two broad categories of toxic tort cases. In the first category, the toxicity of a drug or chemical has been recognized by the medical community as being toxic and capable of causing the injuries alleged by a plaintiff. *See McClain*, 401 F.3d at 1239. In those cases, plaintiffs do not need to prove general causation. *See id.* In the second category of cases, there has been no such recognition by the medical community. *Id.* Therefore, a plaintiff proceeding in the second category of cases must prove both general and specific causation. *Id.* In the Williams Order, this Court determined Plaintiffs' cases fall under the second category. *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *9.

As this Court previously stated, "[g]eneral causation . . . is concerned with whether a 'drug or chemical can cause the harm plaintiff alleges,' that is, whether a chemical agent 'increases the incidence of disease in a group.'" *Id.* at *8 (citing

*McClain*, 401 F.3d at 1239).   The Eleventh Circuit has recognized three "primary" scientific methodologies as being "indispensable" to proving general causation in a toxic tort case: (1) epidemiological evidence, (2) dose-response relationship, and (3) the background risk of disease.   *Chapman*, 766 F.3d at 1308.   "A general causation opinion that is not supported by at least one of these primary methodologies is unreliable as a matter of law."   *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1306 (N.D. Fla. 2018).   By the same token, the reliability of a general causation opinion is called into question if it considers only one of these primary methods and ignores the others.   *See Chapman*, 766 F.3d at 1307–08.   Each of these methodologies are discussed below.

   A.   **Epidemiology**

   Epidemiology "is generally considered to be the best evidence of causation in toxic tort actions."   *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002).   Epidemiology is "the branch of science that studies the incidence, distribution, and cause of disease in human populations," *In re Abilify*, 299 F. Supp. 3d at 1306, and "examine[s] the pattern of disease in human populations," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 n.2 (1997).   There are two steps in establishing causation through epidemiology.   The first step requires the expert to identify an association noted in the literature between the drug or chemical in question and the complained of condition.   *In re Deepwater Horizon Belo Cases*,

2020 WL 6689212, at *10 (citing Michael D. Green et al., *Reference Guide on Epidemiology*, in Reference Manual on Scientific Evidence 566 (Federal Judicial Center, 3d ed. 2011) (hereinafter, "Ref. Man.")).  As this Court stated in the Williams Order, "in the absence of a statistical association supported by an epidemiologic study, 'secondary' evidence, even within the Bradford Hill factors, such as biological plausibility, case studies, adverse event reports, animal and *in vitro* studies, standing alone or in the aggregate, are 'insufficient proof of general causation.'"  *Id*. (citations omitted).

Once an association is identified, in the second step, the expert determines whether the association represents "a true cause-effect relationship" between exposure and the disease.  *Id.* (citing Ref. Man. at 597).  To make that determination, an expert applies the following nine factors developed by Sir Austin Bradford Hill ("the Bradford Hill Factors"):[9] (1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of the findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge.  *See id.* (citing Ref. Man. at 599–600).  No one factor is dispositive and one or more factors may be absent even when a true causal

---

[9] *See* Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 58 Proc. Royal Soc'y Med. 295 (1965).

relationship exists.  Ref. Man. at 600.  Determining whether an association is causal is a matter of scientific judgment, and scientists reliably applying the Bradford Hill factors may reasonably come to different conclusions about whether a causal inference may be drawn.  *Milward v. Acuity Specialty Prods. Group, Inc.*, 639 F.3d 11, 18 (1st Cir. 2011); *see also* Ref. Man. at 553, 600.

## B.    Dose-Response

Another primary methodology for establishing causation is through evidence of a dose-response relationship, which is a "relationship in which a change in amount, intensity, or duration of exposure to [a chemical] is associated with a change—either an increase or decrease—in risk of" adverse effects from that exposure.  *McClain*, 401 F.3d at 1241–42.  The relationship between dose and response is "the hallmark of basic toxicology" and the "single most important factor to consider" in evaluating the toxicity of a drug or chemical.  *Id.* at 1242; *see also Chapman*, 766 F.3d at 1307.  This is because virtually all substances have the potential to be harmful at high enough doses.  *See id*; *see also* Bernard D. Goldstein et al., *Reference Guide on Toxicology*, in Ref. Man. at 636.  Inherent in this principle is the fact that, for the vast majority of substances, there are threshold doses below which no individual will respond and doses above which nearly everyone responds.  *See McClain*, 401 F.3d at 1242.  Consequently, a reliable expert opinion on general causation should address what levels of exposure to a drug or

chemical increase the risk of adverse effects. *See id.* at 1241. Indeed, "'[t]he expert who avoids or neglects [this] principle of toxic torts without justification casts suspicion on the reliability of his methodology.'" *Kilpatrick v. Breg., Inc.*, 613 F.3d 1329, 1339 (quoting *McClain*, 401 F.3d at 1242).

### C.   Background Risk of Disease

Finally, "background risk" of disease "is the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges *without* exposure to the drug or chemical in question. The background risks include all those causes of a disease, whether known or unknown, excluding the drug or chemical in question." *McClain.* 401 F.3d at 1243 (emphasis in original). This is important because the aim of the other primary methodologies is to identify "agents that are associated with an increased risk of disease." *See* Ref. Man. at 552. An expert must know the background prevalence of a disease before he can determine whether the risk of that disease is increased as a result of exposure to the agent. *See In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d 1345, 1355 (S.D. Fla. 2011), *aff'd sub nom.*, *Chapman*, 766 F.3d 1296. Without background risk to establish a baseline, it is difficult to determine whether any incidence of a disease in individuals exposed to an agent is anything more than a coincidence. *Chapman*, 766 F.3d at 1308. Thus, a failure to identify or describe the background

risk of a disease is a "serious methodological deficiency" and "substantial weakness" in an expert's general causation opinion. *See id.* at 1307–08.

## IV.   IDENTIFYING A HARMFUL DOSE

Before discussing each expert's opinions, the undersigned will address an argument Plaintiffs raise as to all of their experts and to which Plaintiffs devoted a significant amount of argument at the hearing – that is whether their experts have to identify a harmful dose or level at this stage of the proceedings.

In the Williams Order, this Court held that "[t]o carry the burden on general causation in this toxic tort case, reliable expert testimony 'must demonstrate the levels of exposure that are hazardous to human beings generally,' and the substance's 'general toxicity for the harm Plaintiffs allege.'"  *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *9 (internal citations omitted).  The Court went on to state that an "opinion on general causation in the context of the instant cases is only helpful and a good 'fit' if it reliably shows 'general toxicity for the harm Plaintiffs allege' and establishes an exposure level that is considered 'hazardous to human beings generally.'"  *Id.* at 15 (quoting *McClain*, 401 F.3d at 1239, 1241).

As the Eleventh Circuit stated in *McClain*, "scientific knowledge of the harmful level of exposure to a chemical" is considered "a minimal fact[ ] necessary to sustain the plaintiff's burden" in a toxic tort case.  *McClain,* 401 F.3d at 1241

(quoting *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)) (alterations and internal quotation marks omitted). Consistent therewith, courts in the Eastern District of Louisiana have excluded an expert in a plethora of BELO cases for the expert's failure "to identify a harmful level of exposure to a specific chemical." *See, e.g.*, *Coleman v. BP Expl. & Prod., Inc.*, 2022 WL 2314400, at *6 (E.D. La. June 28, 2022), *reconsideration denied sub nom.*, *Dawkins v. BP Expl. & Prod., Inc.*, 2022 WL 4355818 (E.D. La. Sept. 20, 2022).[10]

Nonetheless, Plaintiffs argue their experts do not have to identify a harmful level at which any chemical in the weathered oil or dispersants can cause the LMPCs at issue. While acknowledging a harmful level must be established for specific causation, they argue it is not a general causation requirement, unless the expert is proceeding under the dose-response method.[11] They argue the Eleventh Circuit's reference to a harmful level requirement in *McClain* related to specific, rather than general causation. They argue the Eastern District of Louisiana courts in the other BELO cases simply got it wrong. They distinguish this Court's holding in the

---

[10] These cases relate to the exclusion of general causation expert Dr. James Cook who, while not designated by the Downs Group Plaintiffs, has been designated by the Falcon Group Plaintiffs in these test cases. *See, e.g.*, *Dawkins v. BP Exploration & Prod., Inc.*, 2022 WL 2315846, at *6 (E.D. La. June 28, 2022), *reconsideration denied*, 2022 WL 4355818 (E.D. La. Sept. 20, 2022); *Williams v. BP Expl. & Prod., Inc.*, No. 18-9753, 2019 WL 6615504, at *8 (E.D. La. Dec. 5, 2019) (citing *Knight*, 482 F.3d at 351); *Lee v. BP Expl. & Prod., Inc.*, No. 18-10381, 2020 WL 6106889, at *4 (E.D. La. Sept. 29, 2020) (internal citations, alterations, and quotation marks omitted).

[11] Plaintiffs' argument makes no practical sense. Why would one methodology require a hazardous level to be established at general causation, while another does not.

Williams Order as being limited to a toxicologist seeking to prove general causation through a dose-response relationship.  They argue this Court recognized that failure to identify a harmful dose is not fatal to general causation in *In re Abilify*, 299 F. Supp. 3d at 1291.  According to Plaintiffs, requiring them to identify a harmful dose "is an impossible, and unfair, standard."  ECF Doc. 513 at 34.  The undersigned finds Plaintiffs' arguments to be strained at best.

First, Plaintiffs improperly recast Dr. Williams' opinions.  Although Dr. Williams was a toxicologist, it is inaccurate to say Dr. Williams relied on the dose-response methodology as her primary method for establishing causation.  To the contrary, in the Williams Order, the Court specifically noted that "a review of epidemiological studies forms the basis of" Dr. Williams' opinions.  *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *10.  The majority of the Court's 58-page opinion is dedicated to discussing Dr. Williams' failure to critique the epidemiological studies, failure to rely on relevant studies, and failure to adequately apply the Bradford Hill factors to the epidemiological studies she considered.  In fact, the only time the Court discusses the dose-response relationship is to note that Dr. Williams did not give any meaningful consideration to it in her Bradford Hill analysis.  *See id.* at *14.

Second, this Court did not hold in *In re Abilify* that a general causation expert need not identify a harmful dose.  Unlike BP, the defendant in *In re Abilify* did not

seek to exclude plaintiffs' general causation experts for failure to identify a harmful dose; thus, whether a harmful dose was needed was not addressed.  Regardless, unlike this case, the plaintiffs' experts in *In re Abilify* offered evidence of a harmful dose, through both case studies and adverse event reports.[12]  *In re Abilify*, 299 F. Supp. 3d at 1330.  While the Court questioned the strength of such evidence and thus found it lacked "the intrinsic reliability that is the hallmark of a primary methodology under Eleventh Circuit *Daubert* jurisprudence," the Court nonetheless found the evidence "relevant and admissible" as a supplement to plaintiffs' epidemiological study.  *Id.* at 1330–31, 1345.  Thus, Plaintiffs' reliance on *In re Abilify* as negating a requirement for their experts to provide a harmful dose is simply misplaced.

Plaintiffs also rely on the Eastern District of Tennessee's decision in *Adkisson v. Jacobs Engineering Group, Inc.*, 342 F. Supp. 3d 791 (E.D. Tenn. 2018).  In *Adkisson* the court rejected defendant's argument that plaintiffs needed to prove their individualized dose or exposure at the general causation stage.  *Id.* at 799 ("Because general causation is something all plaintiffs have in common, individualized proof cannot be necessary.  Indeed, that is why general causation is often litigated on a class-wide, or at least collective or consolidated, basis.").  The court went on to explain, however, that it was not suggesting exposure and dose are irrelevant to the

---

[12] The undersigned also notes that the Etminan study relied upon by the experts was a study involving at least one prescription of Abilify; thus, a threshold dose was included in the study.  *In re Abilify*, 299 F. Supp. 3d at 1313.

general causation inquiry.  *Id.*  Noting "the dose makes the poison," the court stated that "to say that a chemical agent is capable of causing a disease—i.e., that plaintiffs' burden on general causation is satisfied—without some reference to a particular dose, would be incoherent."  *Id.* at 799–800.  Moreover, the court noted that, unlike the expert in *McClain* who concluded that "any amount of Metabolife is too much," the expert before it "identified the levels of many toxic constituents present in the Kingston fly ash, analyzed hundreds of peer-reviewed epidemiological studies, and has applied the Bradford-Hill criteria to evaluate the strength of the associations found in the literature, to conclude that plaintiffs' exposure . . . was capable of causing the complained-of diseases."  *Id.* at 803.  Thus, *Adkisson* is directly contrary to Plaintiffs' position.

Finally, an argument similar to the one Plaintiffs make here was recently rejected by the Southern District of Florida in the Zantac MDL litigation.  *In re: Zantac*, 2022 WL 17480906, at *16.  Similar to Plaintiffs here, in *In re: Zantac*, the plaintiffs argued "they d[id] not have to identify *how much* ranitidine consumption can cause cancer—the threshold—and may instead show that the highest dosage any Plaintiff could have realistically consumed could cause cancer."  *Id.* at 16 (emphasis in original).  The *In re: Zantac* defendants, like BP, argued "Plaintiffs must identify the point at which ranitidine consumption becomes toxic—the threshold."  The court agreed with defendants because "[their] position on threshold dose is well grounded

in binding, published, and analogous Eleventh Circuit case law." *Id.* at 17. The undersigned notes that the plaintiffs' experts in *In re: Zantac* included an epidemiologist *and* the issue before the court was general causation. *Id.*

Thus, as an initial matter, the undersigned finds, consistent with *McClain*, other cases from this Circuit, and other BELO cases, that to be reliable and helpful*,* a general causation expert in these BELO cases must identify a harmful level at which a chemical in the oil or dispersant can cause the LMPCs at issue here. *See McClain*, 401 F.3d at 1241–42 (because all substances have the potential to be toxic, an expert's failure to identify a harmful dose renders their opinions unreliable and unhelpful).

## V.   THE EXPERTS' OPINIONS

The Downs Group Plaintiffs have designated four (4) general causation experts: Dr. David Carpenter, Dr. Gina Solomon, Dr. Michael Freeman, and Dr. Ranajit Sanhu.  Except for Dr. Carpenter, BP does not contest the qualifications of the experts to provide opinions on general causation.  Each opinion is discussed below.

### A.   Dr. Gina Solomon

Gina Solomon, M.D., is a medical doctor trained and certified in the field of occupational and environmental medicine.  ECF Doc. 466-1 at 3.  Among other roles, Dr. Solomon currently serves as a clinical professor of medicine at the University of California San Francisco.  *Id.*  Dr. Solomon provided two 17-page reports (excluding references), one for Plaintiff Jenkins and one for Plaintiff Siples. ECF Doc. 466-1 and ECF Doc. 466-2 (Exhibits A and B to the *Daubert* motion) (Since the reports are essentially identical, the undersigned cites to Jenkins' report only).

In paragraph 4 of her reports, Dr. Solomon offers the following general causation opinions:[13]  (1) "inhalation of aerosols that consist of petroleum hydrocarbons[14] and dispersant cause damage to the protective cilia that line the interior upper respiratory tract," (2) "these same aerosols cause inflammation of the upper respiratory tract, including mucous membranes of the nose, sinuses, and throat," (3) which "manifests as acute sinusitis [and] which may become chronic sinusitis over time."  ECF Doc. 466-1 at 3.  BP seeks to exclude Dr. Solomon's opinions as both unreliable and unhelpful because Dr. Solomon does not provide a

---

[13] Dr. Solomon also offers the opinion that exposure to aerosol mixtures of petroleum and dispersants from the BP oil spill caused or substantially contributed to Jenkins' and Siples' development of chronic sinusitis.  The parties agreed this is a specific causation opinion, which the Court need not address at this stage of the proceedings.  ECF Doc. 466-1 at 3.

[14] Although it is Dr. Solomon's opinion that particulate matter in the oil can cause chronic sinusitis, she has not been able to isolate the properties of the particulate matter.  G. Solomon Depo., at 43:10–14.

dose level at which an exposure to hydrocarbons can cause chronic sinusitis and Dr. Solomon fails to follow the well settled methodology for evaluating the cause and effect in epidemiological studies.   After reviewing the voluminous evidence presented by the parties, including BP's motion, ECF Doc. 466, Dr. Solomon's reports, ECF Docs. 466-1 & 466-2, Dr. Solomon's deposition testimony, ECF Doc. 466-3, Plaintiffs' response, ECF Doc. 514, and Dr. Solomon's two supplemental declarations,[15] ECF Docs. 514-3 and 556-1, the undersigned finds Dr. Solomon's opinions should be excluded as unreliable and unhelpful.

### 1. Failure to Identify a Harmful Dose

As discussed above, the undersigned disagrees with Plaintiffs that a general causation expert in these BELO cases does not have to identify a harmful dose.  Dr. Solomon, however, does not do so.  Dr. Solomon admits in her deposition that her reports do not identify a harmful level of exposure to crude oil or dispersant that would cause the chronic sinus conditions at issue, G. Solomon Depo., at 78:15–21,

---

[15] In response to BP's *Daubert* motion, Plaintiffs submitted two declarations from Dr. Solomon, ECF Docs. 514-3 (attached to the Opposition) and 556-1 (attached to the Sur-reply).  BP filed a motion to strike the second declaration, but not the first.  ECF Doc. 561.  As to the first declaration, BP chose, instead, to seek leave to file a reply, ECF Doc. 530, to address the additional materials contained in the declaration.  The undersigned granted that request, and BP filed a reply, ECF Doc. 543, which included declarations from its own experts, Robert Cox, M.D., Ph.D., and Dominik Alexander, Ph.D.  In response, Plaintiffs filed a request to file a sur-reply, which was granted, and in that sur-reply, Plaintiff included a second declaration from Dr. Solomon.  ECF Doc. 556.  BP filed a motion to strike that second declaration, ECF Doc. 561, and, after the hearing, Plaintiffs filed a response, ECF Doc. 565.  The Court will consider the second declaration over BP's objection as it merely contains arguments in response to the declarations of BP's experts.  Thus, BP's motion to strike, ECF Doc. 561, is DENIED.

and she has made no attempt to do so, *id.* at 79:3–8.  Dr. Solomon admits she does not "have enough information in the literature to be able to identify a harmful level of exposure."  *Id.* at 79:16–25, 80:1–9.

In her second supplemental declaration, Dr. Solomon argues identifying a specific chemical or a dose level is not feasible.  ECF Doc. 556-1.  She references the lack of dose information when considering whether asbestos causes mesothelioma or tobacco causes lung cancer.  *Id.* at 3.  This argument is not well-taken.  As the Eleventh Circuit stated in *McClain*, asbestos and cigarette smoke are toxins that the medical community generally has recognized as being toxic and as causing cancer.  401 F.3d at 1239.  Thus, those chemicals fall in the "first category" of toxic tort cases for which *only* specific causation is at issue.  *Id.*  As stated above, this is not a first-category case.  To the contrary, it is not widely accepted in the medical community that oil, dispersants, or any chemicals therein can cause common conditions such as chronic sinusitis or conjunctivitis at any level.

Plaintiffs argued at the hearing that Dr. Solomon has provided a "qualitative" rather than a "quantitative" dose, and points to paragraphs 32 and 33 of the report, wherein she opines that an exposure to hydrocarbons in the oil for "multiple weeks or months" is sufficient "to overwhelm the body's natural defenses against particles."  ECF Doc. 466-1 at 13.  The undersigned finds no merit to this argument.  Plaintiff cites to no authority finding a qualitative dose to be sufficient.  Regardless,

the duration identified by Dr. Solomon of "weeks" or "months" is simply too imprecise to be helpful.  Likewise, an opinion about the minimum duration of exposure without quantifying a harmful level is also not helpful.  Putting it in the most basic terms, the chance an individual is going to be harmed cannot be the same for an individual exposed to one tarball a day for a month as an individual exposed to 15 tarballs a day.  Moreover, even if the Court were to accept Dr. Solomon's "qualitative" dose opinion, Dr. Solomon failed to follow acceptable methodology in identifying an association between the hydrocarbons and the LMPCs at issue or identifying the cause-and-effect relationship between hydrocarbons and chronic sinusitis.

    2.  <u>Failure to Identify an Association, to Critique the Epidemiology Studies, or to Apply the Bradford Hill Factors</u>

Under *Daubert*, "courts must carefully analyze the studies on which experts rely for their opinions before admitting their testimony."[16] *Knight*, 482 F.3d at 355. Courts "may exclude expert testimony based on epidemiological studies where the studies are insufficient, whether considered individually or collectively, to support

---

[16] There are three different types of epidemiological studies:  cohort studies, case control studies and cross-sectional studies.  "A cohort study measures and compares the incidence of disease in the exposed and unexposed (control) groups."  *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *9 n.30 (citation and internal quotation marks omitted).  "A case-control study measures and compares the frequency of exposure between a group where participants have the disease (cases) and a control group where participants do not have the disease."  *Id.*  "In a cross-sectional study, both exposure and disease are determined in an individual at the same point in time, and therefore, it is not possible to establish the temporal relation between exposure and disease from this type of study."  *Id.*

the expert's causation opinion." *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 875 (S. D. Ohio 2010) (citing *Joiner*, 522 U.S. at 146–47).  A court may conclude "there is simply too great an analytical gap between the data and the opinion" offered.  *Joiner*, 522 U.S. at 146.  Courts have excluded expert opinions on causation based on epidemiological and other scientific studies for several reasons, including:  (1) the studies "do not represent statistically significant results," (2) the studies merely provide "a suggestion or possibility of a relationship;" (3) the studies are "inconclusive;" (4) the studies note "that the subjects were exposed to a range of substances and then nonspecifically notes increases in disease incidence;" (5) the studies "do not examine the precise disease at issue;" and (6) the studies' authors "expressly disclaim the causal relationship that the expert relies upon the study to prove." *Burst v. Shell Oil Co.*, 2015 WL 3755953, at *6–7 (E.D. La. June 16, 2015) (collecting cases), *aff'd*, 650 F. App'x 170 (5th Cir. 2016).

Here, while Dr. Solomon relies on epidemiological studies to support her general causation opinions, she fails to provide more than a cursory discussion, limited mostly to a few sentences describing the study, for the five (5) studies in her report.  *See* ECF Doc. 466-1 at 15–16.  For example, all she writes about the McGowan 2017 study is that it is "[a] study in BP oil spill clean-up workers exposed to Corexit EC9527A/EC9500A [which] found significant evidence of respiratory toxicity with significant increases in burning and irritation of the nose, throat and

lungs in exposed workers." *Id.* at 15.  Dr. Solomon omits other critical limitations of the McGowan study, including that it is a cross-sectional study based on self-reported symptoms, which could result in bias, over-reporting of symptoms and exposure misclassification.  D. Alexander Expert Report, ECF Doc. 469-4 (attached to *Daubert* motion for Dr. Freeman).[17]  Additionally, the study focused on acute, rather than chronic conditions.  *Id.* at 43.  Because of these limitations, the authors specifically stated the results "*do not allow exploration of exposure-response relationships.*"  *Id.* at 47.

In her first declaration, submitted in response to BP's motion, Dr. Solomon points out that she "critiqued" the studies.  ECF Doc. 514-3 at 3.  Dr. Solomon uses that term liberally.  Aside from a one-sentence description of the Velazquez 2020 study, Dr. Solomon merely notes that the study does not "differentiate between specific types of vapors, gases, fumes and mists."  ECF Doc. 466-1 at 15.  She does not explain how the study is relevant to her opinions or even how she relied upon it.  She further does not explain the "extent to which [these] limitations compromise [her] findings … about causation."   Ref. Man. at 553 ("Assessing whether an association is causal requires an understanding of the strengths and weaknesses of

---

[17] As noted in the discussion of Dr. Carpenter's opinions, *infra*, Dr. Carpenter agreed cross-sectional studies, such as the McGowan study, are not designed to determine causal relationships.

the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge.").

Also, of the five (5) studies included in the report, the only study which Dr. Solomon considered to be of "low reliability" was the Dietz de Loos 2021 study, a cross-sectional study which identified no association between exposure to household cleaning products and sinusitis. ECF Doc. 466-1 at 16. Even so, she does not discuss how that failure affected her reliance on the study or even how the study played into her opinion. Dr. Solomon's report contains no "discussion, critique, or assessment of the quality, design, or relevance" of any study on which she relies. *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *12.

According to Dr. Solomon's declarations, she primarily relied on the Rusiecki 2022 study (sometimes referenced by others as the 2021 study) to show an association between exposure to the DWH Spill and chronic sinusitis. The Rusiecki study, titled "Incidence of Chronic Respiratory Conditions Among Oil Spill Responders: Five Years of Follow-up in the Deepwater Horizon Oil Spill Coast Guard Cohort Study," is a prospective cohort study of over 40,000 U.S. Coast Guard ("USCG") members identified as those who responded to the DWH Spill versus non-responders, which contains some cross-sectional components. ECF Doc. 543-1. The cohort group, consisting of those who responded to the DWH Spill, included 8,696 USCG personnel. *Id.* at 3. Within the responders group, the study then

considered different types of exposures: (1) exposure to crude oil via any route versus no exposure; (2) exposure to crude oil via inhalation versus no exposure; (3) ever being in the vicinity of burning oil; and (4) exposure to crude oil and dispersants versus no exposure. *Id.* at 4. While the authors of the study identified symptoms based on available medical records, exposure was based on self-reporting obtained via surveys. *Id.*

Calculated in terms of an adjusted hazard ratio a/k/a relative risk ratio,[18] the study found no increased risk of chronic sinusitis (1) between Coast Guard responders versus non-responders (the largest group) (Table 2); (2) between Coast Guard responders reporting exposure to oil versus those who reported no exposure[19] (Table 3); (3) between Coast Guard responders reporting exposure to oil and dispersants versus those who did not report any exposure (Table 5); and (4) Coast

---

[18] "Relative risk is simply a comparison of the incidence of a disease in exposed individuals with its incidence in unexposed individuals. A relative risk of 1.0 means there is no difference in risk between the exposed and unexposed groups; in other words, there is no association between exposure to the [chemical] and the disease. A relative risk above 1.0 indicates an increased risk in the exposed group, and risks greater than 2.0 permit an inference that the disease was more likely than not caused by the [chemical]. Relative risk estimates are often accompanied by a confidence interval, which provides, in essence, a margin of error. Confidence intervals identify the range of likely values, on either side of the relative risk estimate for a population sample, that would be expected to encompass the results a specified percentage of the time (*e.g.*, 95%) if random samples were repeatedly drawn from the same population as the subject study. Importantly, if the confidence interval contains the value 1.0 or less, then the results of the study are not considered statistically significant. On the other hand, if the lower bound of the confidence interval exceeds 1.0, then the results are considered statistically significant." *In re Abilify*, 299 F. Supp. 3d at 1313–14 (internal citations, quotation marks, and alterations omitted).

[19] When the study for this group was restricted to never smokers, the results were essentially the same – no elevated risk for chronic sinusitis and a reduced risk for chronic rhinitis. ECF Doc. 543-1 at 21, Supplemental Table 4.

Guard responders in the vicinity of in-situ burns versus those who were not there (Supplemental Table 6).  ECF Doc. 543-1.  Interestingly, the study also found a reduced risk for sinusitis for those USCG responders exposed to both crude oil and dispersants (Table 5) and a reduced risk for chronic rhinitis for those who were exposed to oil versus those who were not (Table 3)[20].  *Id.*

Although the study found no statistically significant association between (1) chronic sinusitis and exposure to crude oil between responders and non-responders, (2) those responders exposed to crude oil versus those who had never been exposed; or (3) those who were exposed to in situ burns versus those who had never been exposed; the study found an increased risk in chronic sinusitis, at a hazard ratio of 1.48 for chronic sinusitis and 1.55 for unspecified chronic sinusitis, for Coast Guard responders who reported inhalation exposure to oil (Table 4).  *Id.* at 7.  *However*, when the cofounders for smokers were removed (i.e., the study was restricted to "never" smokers), the results were statistically insignificant.  ECF Doc. 543-1 at 23 (Supplemental Table 5).

Despite the study's limitations, Dr. Solomon found the study to be "very reliable" because "(1) [i]t is a large prospective cohort study without any selection

---

[20] In her deposition, Dr. Solomon explained chronic rhinitis occurs extremely frequently in the absence of chronic sinusitis.  Thus, if someone has chronic sinusitis, they are very likely to have rhinitis, but the converse may not be true.  G. Solomon Depo., at 146.  This explanation, however, furthers calls the study into question given the negative results for chronic rhinitis.

bias in the cohort; (2) the participants generally had complete medical records both before and after the spill, allowing evaluation of temporality; (3) exposure histories were detailed and collected soon after deployment (in June and November 2010) so would not suffer from recall bias; and (4) the comparisons were limited to never-smokers, so the results were not confounded by smoking."  ECF Doc. 466-1 at 16. The only limitation Dr. Solomon discussed in her reports was that the population was limited to Coast Guard workers, which were likely healthier overall as compared to the general population of cleanup workers.  *Id.* at 17.  Dr. Solomon's perfunctory analysis is not sufficient.

When evaluating epidemiological evidence, "the methodological soundness of a study . . . must be assessed," with "the key questions" being whether a study's limitations compromise its findings and the extent to which the study permits an inference regarding causation.  Ref. Man. at 553–54.  Dr. Solomon, however, ignored the limitations in the Rusiecki study in her report.  She makes no mention of the internal inconsistencies in the findings for the subgroups, and when asked about those inconsistences in her deposition, she stated those issues did not cause her to question the quality of the study.  G. Solomon Depo., at 150:11–14.  She does not discuss the fact that the study included self-reported exposure, even though she admitted in her deposition such self-reports "clearly [make a study] less reliable." G. Solomon Depo., at 61:1–6.  She summarily dismissed the lack of a statistically

significant association between crude oil inhalation exposure and chronic sinusitis when the study was adjusted to exclude ever smokers to the reduction in sample size. G. Solomon Depo., at 165–67; ECF Doc. 514-3 at 3.   Dr. Solomon's wholesale failure to discuss these clear limitations in the Rusiecki study renders her opinions unreliable.   *See Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

In Dr. Solomon's supplemental declaration, she attempts to address these limitations in more detail, but even then fails to provide a sufficient analysis because all she does is address the specific issues raised by BP's expert.  That is not how the epidemiological method works.  As part of the methodology, Dr. Solomon was required to critique the studies she relied on, address the limitations she clearly acknowledged existed, and apply the Bradford Hill factors.  The methodology is not for Dr. Solomon to ignore the limitations until someone points them out to her.

Also, in Dr. Solomon's declarations, she references the Lawrence 2022 study. As an initial matter, Dr. Solomon cannot rely on the Lawrence study to support her opinions because it was not available until after Dr. Solomon issued her report and after she was deposed.  Regardless, the Lawrence study is not relevant because it does not address chronic sinusitis.  Instead, it is a cohort study of over 19,000

cleanup workers and 7,671 nonworkers designed to assess the relationship between exposure to the DWH Spill and *asthma* for workers and non-workers – not the LMPCs at issue here. *See Anderson v. Bristol Myers Squibb Co.*, 1998 WL 35178199, at *9–11 (S.D. Tex. April 20, 1998) (finding that an expert may not use studies purporting to prove one fact in order to infer that the same studies prove a different fact). Regardless, the study contained several limitations which were not discussed by Dr. Solomon. For example, the study was based on self-reported symptoms of wheezing and self-reported physician diagnoses of asthma. *See* ECF Doc. 543-4 at 1, 6 (Lawrence Study); *see also* ECF Doc. 543-3 at 3–4 (Alexander Decl.) (discussing limitations). Also, although the study found the DWH Spill workers had a greater risk of asthma than nonworkers, no statistically significant association was identified once self-reported symptoms of wheezing were removed. *Id.* at 4.

Even if the Rusiecki (or Lawrence) study was sufficient to establish an association *and* Dr. Solomon had provided a critical analysis of the studies, Dr. Solomon failed to meaningfully consider the Bradford Hill factors as is necessary to determine a cause-and-effect relationship. In her report, Dr. Solomon acknowledges "the original conception of causal inference" was developed by Sir Austin Bradford Hill. ECF Doc. 466-1 at 8. Dr. Solomon, however, expends no effort in discussing any of the factors. Instead, Dr. Solomon merely addresses three factors in summary

fashion by stating (1) she evaluated the *quality of the evidence* to ensure bias or confounding is minimal; (2) she considered whether the findings from multiple streams of evidence are *coherent*; and (3) she ensured that *temporality* is met, i.e., that the exposure occurred before the disease.  *Id.* at 8–9.  Although the Bradford Hill factors should not be rigidly applied, an expert must provide more than "lip service" to the factors.  *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *14; *see also Burst*, 2015 WL 3755953, at *10 (finding expert failed "to provide a meaningful analysis in which he reconciles conflicting studies or applies the Bradford Hill criteria to the gasoline-specific studies").  Thus, to the extent Dr. Solomon relies on epidemiology to support her causation opinions, she has failed to employ a reliable methodology.

### 3.  Failure to Discuss Dose Response

In her first declaration, Dr. Solomon argues the Rusiecki study establishes a dose-response relationship.  That, however, can simply not be the case.  A dose-response relationship exists when "a change in amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or decrease— in risk of disease."  *McClain*, 401 F.3d at 1241–42.  The Rusiecki study is an "ever/never" categorical study, which compares those who were ever exposed with

those who were never exposed.[21]   The study did not examine the length of any participant's exposure, the amount of any exposure, or even when the sinusitis was diagnosed.  The study did not provide "any assessment of actual exposure, let alone the level of exposure to a particular chemical."  *See Schexnayder v. BP Expl. & Prod., Inc.*, 2022 WL 11767540, at *8 (E.D. La. Oct. 20, 2022) (noting that the study was "silent on the level of exposure") (citation, internal quotation marks, and emphasis omitted).   Thus, the study does not show an increased exposure to hydrocarbons resulted in an increased risk of chronic sinusitis.  As the Eleventh Circuit stated and this Court reiterated in the Williams Order, "an expert who 'neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology.'"   *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *9 n.29 (quoting *McClain*, 401 F.3d at 1241–42).

---

[21]   BP filed a notice of supplemental authority, ECF Doc. 529, attaching an opinion from the Eastern District of Louisiana, *English v. BP*, No. 17-cv-4325, ECF Doc. 80 (E.D. La. Sept. 26, 2022), granting a motion to exclude James Cook as an expert and describing the Rusiecki study as an "ever/never" study which does not "answer the essential question of what level of exposure is necessary to cause the particular symptoms."  ECF Doc. 529-1 at 19 (emphasis omitted).  Plaintiffs moved to strike the notice, ECF Doc. 537, contending Judge Vitter should be disqualified from deciding BELO cases because she is biased.  *See also Smith v. BP Expl. & Prod., Inc.*, 2022 WL 17403568, at *1 (E.D. La. Dec. 2, 2022) (denying motion to disqualify and recuse).  The undersigned can consider any opinion from another court as persuasive and does so here.  Thus, the motion to strike is DENIED.  Moreover, although Plaintiffs take issue with Judge Vitter's description of the Rusiecki study as an "ever/never" study as "lay-person speak," that term is used by the authors of the study.  ECF Doc. 543-1 at 10.

### 4. <u>Failure to Consider Background Risk of Disease</u>

Dr. Solomon also does not address the background risk of disease in her report, even though she acknowledged the background risk of chronic rhinosinusitis in the general population is over 10%.  G. Solomon Depo., at 55:4–13.  In her deposition, Dr. Solomon contends she thought about the background rates of disease and simply did not discuss it in her report.  *Id.* at 55:14–20. Nonetheless, in her first declaration, Dr. Solomon explains a consideration of background risk of disease is not necessary because exposed and unexposed Coast Guardsmen in the Rusiecki study, "which is a basis of [her] opinion," "face the normal background risk of sinusitis."  ECF Doc. 514-3 at 6.  Dr. Solomon's explanation is a non-starter.  "[A] failure to identify or describe the background risk of a disease is a 'serious methodological deficiency' and 'substantial weakness' in an expert's general causation opinion."  *In re Abilify*, 299 F. Supp. 3d at 1308 (quoting *Chapman*, 766 F.3d at 1308).  Indeed, "[i]gnoring available evidence about background risks may be fatal to an expert's general causation opinion." *Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1280 (N.D. Ala. 2017), *aff'd in part sub nom.*, *Jones v. Novartis Pharms. Co.*, 720 F. App'x 1006 (11th Cir. 2018).

Because Dr. Solomon failed to identify a statistically significant association in the literature, failed to meaningfully critique the Rusiecki 2022 study, or any other epidemiological study, failed to provide more than a hasty discussion of the Bradford

Hill factors, failed to discuss the dose-response relationship or background risk of disease, and failed to identify a harmful dose, the undersigned finds Dr. Solomon's opinions to be neither reliable nor helpful; thus, the opinions should be excluded.

### B.   Dr. David Carpenter

David O. Carpenter, M.D., is a public health expert.  Although he was trained as a medical doctor, he pursued a career in biomedical research and public health rather than patient care.  ECF Doc. 513-1 at 2.  Dr. Carpenter offers the following general causation opinion: "[t]here is strong evidence that exposure to all of the components of crude oil, and especially when the oil exposure is accompanied by exposure to dispersants containing 2-butoxyethanol, increases risk of allergic conjunctivitis and dry eye disease."[22]   *Id.* at 10.   BP argues Dr. Carpenter's qualifications "do not fit" this case.  ECF Doc. 468 at 1.  BP also argues, even if qualified, Dr. Carpenter's opinions are neither reliable nor helpful because Dr. Carpenter (1) failed to identify a chemical or mixture of chemicals he contends could have caused the harm alleged by Plaintiffs or the level of such chemical that can cause the harm; (2) failed to use a reliable methodology to arrive at a statistically significant association; and (3) failed to use any of the three "indispensable" methods

---

[22] Dr. Carpenter also offers the following specific causation opinion: "the keratoconjunctivitis sicca suffered by Mr. Kenneth Davenport and the chronic allergic conjunctivitis and chronic eye irritation suffered by Mr. Michael Moulder were caused by the exposure to crude oil coming from the [DWH Spill] and the dispersant chemicals applied to the Gulf."  ECF Doc. 513-1 at 10.  The parties agreed the Court need not address that opinion at this stage.

for establishing general causation. *Id.* at 1, 13–30.   Upon consideration of the voluminous evidence presented by the parties, including BP's motion, ECF Doc. 468, Dr. Carpenter's report, ECF Doc. 468-1, his deposition, ECF Doc. 468-2, Plaintiffs' response, ECF Doc. 513, and his supplemental declaration, ECF Doc. 513-2, the undersigned finds Dr. Carpenter to be qualified to provide an opinion in these cases on general causation but finds his opinions to be unreliable and unhelpful.

### 1. Qualification

BP argues Dr. Carpenter lacks the requisite expertise to offer opinions regarding general causation because he is not an epidemiologist or toxicologist, is not a practicing doctor, and is "new" to the study of eye conditions and oil spills. ECF Doc. 468 at 4–5.  These facts, however, do not disqualify him from providing an opinion on general causation.

"An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).  "So long as the [expert] is minimally qualified, objections to the level of [his] expertise go to credibility and weight, not admissibility." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009), *aff'd sub nom.*, *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010)

(citation, internal quotation marks, and alteration omitted).   "The critical question for qualification purposes is whether the proffered expert has such 'knowledge, skill, experience, training, or education' that his opinion will aid the trier of fact in understanding the evidence or resolving a factual issue."   *In re Abilify*, 299 F. Supp. 3d at 1348 (quoting Fed. R. Evid. 702).

The fact that Dr. Carpenter is neither an epidemiologist nor a toxicologist does not disqualify him from testifying about epidemiological studies or providing a general causation opinion based on those studies.   *See id.* at 1349; *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 426 (S.D.N.Y. 2016) (stating that "medical doctors do not need to be epidemiologists in order to testify regarding epidemiological studies").   Dr. Carpenter is experienced in public health, a branch of medicine that seeks to identify causes of disease and steps that can be taken to reduce exposure to disease.   D. Carpenter Depo., at 10:1–14.   His research over the last 25 years has included examining the health effects of persistent organic chemicals, air pollutions, environmental exposures, and the diseases that result from those exposures.   *Id.* at 10–11.   While he does not consider himself an epidemiologist or toxicologist, he has published peer-reviewed articles on those topics.   *Id.* at 12.

Moreover, BP has not demonstrated that Dr. Carpenter "does not have the skills or the knowledge to examine epidemiological studies meaningfully." *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 800 (E.D. La. 2011).   Instead,

BP points out that the opinions offered here appear to be the first time Dr. Carpenter has issued an opinion on the oil spill or the LMPCs at issue.  ECF Doc. 468 at 13–15.  That, however, does not mean he is not qualified to do so.  Thus, while Dr. Carpenter may not be the best or most qualified authority in the field of epidemiology or toxicology, the undersigned finds, given the liberal standards for qualification under Rule 702, that Dr. Carpenter's background and education qualify him to provide a general causation opinion.  *In re Abilify*, 299 F. Supp. 3d at 1349 ("A witness need not be the best or most qualified authority in a field to be admitted as an expert"); *Wagoner*, 813 F. Supp. 2d at 800 ("In keeping with the spirit of Rule 702, Dr. Saux will be considered an expert although obviously he would not be held in the same esteem as an expert who is, in fact, an epidemiologist.") (citation, internal quotation marks, and alteration omitted).

## 2.  Failure to Identify Harmful Chemical(s) or a Threshold Level

As set forth in Dr. Carpenter's report, there are over 17,000 chemicals in crude oil.  ECF Doc. 468-1 at 7.  Dr. Carpenter acknowledges "some are not very toxic to humans."  *Id.*  Dr. Carpenter discusses volatile organic compounds ("VOCs") in crude oil, identifies some of those as being benzene, toluene, ethyl benzene and xylene ("BTEX"), and states that of those, benzene is a potent carcinogen.  *Id.*  Nowhere in Dr. Carpenter's report, however, does he link any specific chemical or mixture of chemicals to the LMPCs at issue.  As stated above, Dr. Carpenter's

opinion is based on "exposure to *all* of the components of crude oil, and especially when the oil exposure is accompanied by exposure to dispersants containing 2-butoxyethanol." *Id.* at 10 (emphasis added).

Although Dr. Carpenter references several chemicals that "likely" caused chronic conjunctivitis, *id.* at 7, he admits in his deposition he does not have sufficient information to "focus on individual chemicals," D. Carpenter Depo., at 22:5–7. He cannot point to any study that shows exposure to VOCs can cause chronic eye conditions. *Id.* at 39–41, 50–53. According to Dr. Carpenter, conjunctivitis is caused by an allergic reaction to some chemical – what chemical, however, Dr. Carpenter cannot say. *Id.* at 49–50. It "could be 2-butoxyethanol because it's present in so many consumer products," "[i]t could be a component of the oil itself." *Id.* at 50. In his supplemental declaration, Dr. Carpenter contends the chemicals he links to chronic conjunctivitis are benzene, propylene-glycol, and 2-butoxyethanol. ECF Doc. 513-2 at 5–6. Dr. Carpenter acknowledges, however, that benzene has been connected to an increased risk of cancer – not chronic conjunctivitis, and 2-butoxyethanol to signs of eye and other "irritations" – not chronic conjunctivitis. *Id.*; *see* D. Carpenter Depo., at 41–42 (admitting there is no evidence benzene can cause chronic eye conditions). He also acknowledges 2-butoxyethanol is a chemical included in many consumer products. *Id.* at 47–48.

Dr. Carpenter's opinion that exposure to "components of crude oil" caused an allergy, without the identification of any particular chemical or mixture of chemicals, is insufficient.  As this Court[23] and other BELO courts have found, the failure of an expert to "link any specific chemical that [plaintiff] was allegedly exposed to," renders the opinion unhelpful.  *See, e.g.*, *Wade v. BP Expl. & Prod., Inc.*, 2022 WL 4448232, at *8 (E.D. La. Sept. 23, 2022) ("Dr. Cook's conclusion that there is a cause-and-effect relationship between the respiratory, ocular, and dermal conditions he analyzed and exposure to crude oil, including weathered crude oil, is unhelpful without identifying the specific chemicals and exposure levels capable of causing specific conditions alleged by plaintiff.") (internal quotation marks omitted); *Schexnayder*, 2022 WL 11767540, at *8 (excluding Dr. Cook on the same basis).

Dr. Carpenter also does not identify the minimum dose at which any chemical in the tarballs can cause ocular conjunctivitis.  Instead, in his deposition, Dr. Carpenter explains his opinion is premised on there being no "safe level" for any chemical, much less any chemical in the weathered oil, because, while such chemical "certainly doesn't cause disease," even "one molecule perturbs the physiological

---

[23] In arguing the Court need not consider general causation, as that issue was decided by the MSA, Plaintiffs relied upon some comments made by BP's expert, Dr. Shea.  This Court rejected Plaintiffs' position, however, on several grounds, including that Dr. Shea was "generally referencing the entire universe of substances related to the Deepwater Horizon incident and was not recognizing a scientific link between any specific substance and any particular medical condition."  *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *9.

system."  D. Carpenter Depo., at 35:2–20.  An opinion that any amount is harmful is simply contrary to the law in this Circuit.  As stated above, the identification of a harmful dose is a minimum requirement for establishing general causation in these BELO cases and without this information, an expert's opinion is neither reliable nor helpful.

In sum, Dr. Carpenter's "assum[ption]" a link exists between the LMPCs at issue and "one of the components of either the oil itself manifested in tar balls or the dispersant that was incorporated into those tarballs" simply does not move the needle on general causation.  D. Carpenter Depo., at 70:3–16.  Moreover, as discussed below, even if Dr. Carpenter's reference to "tarballs," generally, was sufficient, the studies Dr. Carpenter relied upon to identify an association between the tarballs and the subject eye disease are not relevant.

### 3. Failure to Identify an Association, to Critique Epidemiological Studies, or to Apply Bradford Hill Factors

As discussed above, a reliable epidemiology method involves two steps.  The first is to identify an association through the literature between the exposure and the LMPCs at issue.  The second is to apply the Bradford Hill factors to establish a cause and effect relationship.  Dr. Carpenter, however, failed to follow either step.

Dr. Carpenter admitted during his deposition there are "no peer-reviewed studies that [he] can point to that identify which component in those tarballs, or the whatever was washing up on the beach, is responsible for the acute and the chronic

event," complained of by the Plaintiffs.  D. Carpenter Depo., at 73:12–17.  Instead, Dr. Carpenter relies on "the aggregate scientific literature," pertaining to other oil spills and the DWH Spill in an attempt to establish an association between conjunctivitis and oil, *id.* at 22:15–16, and argues the association does not have to be statistically significant.

Starting with the latter argument, several courts have determined that to be reliable and helpful an association must be statistically significant.  *See, e.g.*, *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806434, at *12 (M.D. Fla. June 18, 2009) ("the reliability of an expert's opinion should be seriously questioned, and perhaps even excluded altogether, when the expert can point to *no* evidence showing a statistically significant increased risk of disease") (emphasis in original); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 533–34 (W.D. Pa. 2003) (finding medical experts' general causation opinions unreliable because none of the epidemiologic studies upon which they relied showed a statistically significant positive association between the drug and the disease at issue).  "The Bradford–Hill criteria can only be applied after a statistically significant association has been identified."  *See, e.g.*, *Frischhertz v. SmithKline Beecham Corp.,* 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 924 (D.S.C. 2016) ("[w]hile a causation opinion need not be based on epidemiological studies, it is well

established that the Bradford Hill method used by epidemiologists *does* require that an association be established through studies with statistically significant results") (internal citation omitted) (emphasis in original).[24]

The Court, however, need not decide whether an association must be statistically significant here because, as discussed below, none of the studies relied upon by Dr. Carpenter, alone or in totality, identify an association, much less a statistically significant one, between any chemical or mixture of chemicals in the oil and conjunctivitis, and Dr. Carpenter's attempt to extrapolate an association from the studies is too great a leap.  Moreover, Dr. Carpenter's analysis of those studies is conclusory, at best.

The analysis section of Dr. Carpenter's 9-page report includes a 1½-page description of the DWH Spill, a ½-page description of conjunctivitis, and a 1-page description of the conclusions of the studies he relied upon in reaching his general causation opinion.   ECF Doc. 468-1 at 6–9.   Those other studies include the following:

---

[24] Plaintiffs cite to *Acerra v. Trulieve Cannabis Corp.,* 2021 WL 1269919, at *5 (N.D. Fla. Mar. 18, 2021), as supporting their position that Dr. Carpenter is not required to prove a statistically significant association.  ECF Doc. 513 at 29-30.  Plaintiffs' reliance on *Acerra* is misplaced. *Accerra* was a suit brought under the Private Securities Litigation Reform Act based on material misstatements or omissions in defendant's public filings.  The language Plaintiffs quote from Judge Hinkle pertains to the requirement that plaintiffs show "something more" than the existence of reports of adverse events for a drug to succeed on a fraudulent omission claim.  Neither that case nor the Supreme Court's decision in *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) cited by Judge Hinkle, has anything to do with general causation in a toxic torts case.

- The *Sea Empress* oil spill, discussed in the Lyons (1998) article, occurred in 1996 at the harbor entrance off the coast of Wales.  The oil reached the shoreline within a week.  Residents living in the nearby coast area reported sore eyes.

- The Awoyesuku cross-sectional study of 1,726 residents of communities affected by crude oil spillage in Nigeria.  The residents attended a free eye screening event in 2018, which showed 6.5% had allergic conjunctivitis.  But there was no unexposed comparison group.

- The Na (2012) and Kim (2013) studies of the *Hebei Spirit* oil spill which occurred 5 miles off coast of South Korea.  The Na study evaluated the long-term health effects on responders.  The Kim study evaluated the long-term health effects of residents living near the oil spill and found elevated rates of conjunctivitis in both men and women.

- The Omoti study, which showed a higher rate of allergic conjunctivitis among technical workers than non-technical workers of the Nigerian National Petroleum Corporation who worked in refineries.

Nowhere in the report does Dr. Carpenter explain how other oil spills (e.g., *Sea Empress* spill, *Hebei Spirit* spill), which occurred close to shore, support his opinions or are relevant to the DWH Spill, which occurred over 100 miles from shore, and took more than a month to reach the shoreline.  He does not discuss the differences between the composition of crude oil in those other spills and the composition of weathered oil at issue for the DHW Spill.  He does not address how oil spills, which occurred in Wales and South Korea, respectively, are relevant to the DWH Spill, which occurred off the coast of Florida.  He does not discuss the fact that some of these studies involved acute health symptoms rather than chronic ocular

disease.  Instead, all he provides is the place of the spill, the year of the spill, and the results of the studies.  ECF Doc. 468-1 at 9.

When questioned about these differences in his deposition, Dr. Carpenter stated he was not sure he found such differences to be "very important."  D. Carpenter Depo., at 62:2–9.  In the Williams Order, however, this Court determined such differences are important and such studies have no relevance to the issues at hand without explanation.  *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at * 13 (criticizing Dr. Williams' reliance on studies that "occurred close to shore and involved fresh crude oil, whereas the Deepwater Horizon spill occurred approximately 125 miles offshore of Florida . . . , and exposed cleanup workers on Florida beaches to weathered oil").

Dr. Carpenter's discussion of studies related to the DWH Spill is likewise deficient.[25]  Dr. Carpenter identifies Alexander 2018 and Rusiecki 2018 as two studies he considered.  ECF Doc. 468-1 at 10.  He admits in his deposition, however, that neither reported on eye symptoms.  D. Carpenter Depo., at 81:10–17.  He references the Krishnamurthy 2019 study as a study reporting health effects of clean-up workers in the Coast Guard cohort at the end of their deployment.  ECF Doc. 468-1 at 10.  Other than briefly describing the study and its results, Dr. Carpenter

---

[25] In Dr. Carpenter's declaration he also discusses the Lawrence 2022 study.  As discussed above under Dr. Solomon's opinion, that study was also not based on Plaintiffs' illnesses, but on asthma.

says no more about the study.  *See id.*  Yet, in his deposition he acknowledged the study was based on self-reports, was a cross-sectional study, and was based on acute neurological symptoms, not conjunctivitis.  D. Carpenter Depo., at 81–85.  Dr. Carpenter claims he considered those limitations, but neither his report nor his declaration bear that out.  Plaintiffs also argue "[a]ll chronic illnesses started as acute illnesses," to support Dr. Carpenter's reliance on studies such as the McGowan 2017 study, the Na 2012 study, and the Lawrence 2022 study, which are based on self-reported or other reports of acute symptoms.  ECF Doc. 513 at 25.  This cursory and circular explanation, however, is not sufficient.  While certainly some acute symptoms can lead to chronic conditions, that is not always the case.  Thus, it was incumbent upon Dr. Carpenter to discuss how he makes that extrapolation for these particular LMPCs.[26]

Dr. Carpenter relies on the D'Andrea 2013 study,[27] but fails to address selection bias, which was a limitation of the study Dr. Carpenter acknowledged in his deposition.  D. Carpenter Depo., at 95-97.  He does not discuss the fact or effect of the study looking at people from Louisiana versus Florida.  *Id.* at 92:6–9.  He does

---

[26] In the Williams Order, the Court noted that BP's expert, Dr. Cox, stated, "it is not medically or toxicologically acceptable to do a causation analysis for acute conditions, then to substitute that analysis to support conclusions about chronic conditions."  *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *13 (internal quotation marks and alteration omitted).

[27] Dr. Carpenter describes the D'Andrea study as a retrospective study of 117 clean-up workers as compared to 130 unexposed persons, which reported elevated risks of double vision and blindness for the cleanup workers.  ECF Doc. 468-1 at 10.  The participants were referred to the clinic for medical evaluation by their legal representatives.

not address the fact that this study, like the others, was also based on acute symptoms and was not based on conjunctivitis. *Id.* at 91:2–16. There are no discussions of the fact the McGowan 2017 study was a cross-sectional study, which by Dr. Carpenter's own admission is "not designed to determine causal relationships." *Id.* at 87:2–9. Dr. Carpenter did not discuss *any* of the limitations associated with any of the studies he relies upon, despite admitting in his depositions that the limitations exist. *Id.* at 81–87. As this Court stated in the Williams Order, "[a]n expert opinion, even if supported by a lengthy list of case studies and treatises, is not reliable without an explanation of the logical steps supporting it." *In re Deepwater Horizon Belo Cases,* 2020 WL 6689212, at \*12.

Second, despite acknowledging that in his practice when he examines evidence for causation, he employs the Bradford Hill factors, ECF Doc. 468-1 at 4–5, in his report, Dr. Carpenter merely identifies the factors without discussing their application to any study. Dr. Carpenter does not indicate which factors were met or how they were met. He does not even identify in the report which factors he considered. Simply listing the factors and defining them do not equate to an analysis. As this Court stated in *In re Abilify*, "it is crucial that the expert describe each step in the process by which he gathered and assessed relevant scientific evidence." *In re Abilify*, 299 F. Supp. 3d at 1311. Otherwise, what the expert is asking the Court to do is accept his *ipse dixit* as evidence of causation, which the Court cannot do.

*See id.*  Thus, the undersigned finds that, to the extent Dr. Carpenter relies on epidemiology to support his general causation opinion, he has failed to follow acceptable methodology.

### 4. Failure to Consider Dose Response

Dr. Carpenter has also not provided any discussion of a dose-response relationship.  Dr. Carpenter explains in his deposition that he considered dose-response as one of the Bradford Hill factors.  D. Carpenter Depo., at 31–32.  His report, however, contains no evidence of any such consideration.  Instead, in the report, after identifying dose-response as a "key" factor, he contends it is often difficult to quantify and "the lack of a clear dose-response relation does not invalidate causal connection."  ECF Doc. 468-1 at 5.  Plaintiffs argue "[a] dose response relationship was demonstrated in all 18 epidemiological studies evaluating oil spills and eye disease that Dr. Carpenter relied on," with "varying degree of statistical significance".  ECF Doc. 513 at 38.  As discussed above, the studies Dr. Carpenter relies upon are inapposite.  Also, despite Plaintiffs' broad statement, neither Plaintiffs nor Dr. Carpenter point to any place in those studies where a dose-response relationship between a chemical in the oil and chronic conjunctivitis is identified.

5.  Failure to Consider Background Risk of Disease

Plaintiffs do not dispute Dr. Carpenter has engaged in no background risk analysis.   Instead, Plaintiff argues "[a]ny epidemiological studies that include 'control groups,' by default, account for the background risk for disease." *Id.* at 39. Regardless of whether background risk is taken into consideration in those studies, it is nonetheless necessary for Dr. Carpenter, if he is going to give a general causation opinion, to consider whether the Plaintiffs could have suffered from conjunctivitis based on other sources.  This is particularly true since Dr. Carpenter acknowledged, "[c]onjunctivitis is a common disease," of which there are "multiple causes."  ECF ECF Doc. 468-1 at 8.  Moreover, as stated above, according to Dr. Carpenter, 2-butoxyethanol is present in many consumer products; and yet there is no analysis of whether the "allergy" Plaintiffs developed to that chemical came from the cleanup efforts versus exposure to those common consumer products.  *See id.*  Instead, Dr. Carpenter simply assumes the reverse – that Plaintiffs must have developed the allergy from exposure to the dispersants, and because 2-butoxyethanol is in other consumer products and Plaintiffs continued to be exposed to the chemical even after the cleanup efforts had ended, the allergy became permanent.  *Id.*  That assumption, however, is purely speculative and not based on any of the three primary methods for supporting general causation.  *See Benkwith v. Matrixx Initiatives, Inc.*, 467 F. Supp. 2d 1316, 1329 (M.D. Ala. 2006) ("Dr. Jafek admits in his report that there are

hundreds of reported causes of anosmia.  However, Dr. Jafek has not identified the additional risk that Zicam exposure poses over the risk of anosmia to the general population.").

### 6. Weight of the Evidence

Plaintiffs argue in their written opposition that Dr. Carpenter employed a "weight of the evidence approach," using epidemiological principles.  ECF Doc. 513 at 26.  Similarly, in his declaration submitted in response to BP's motion, Dr. Carpenter discounts the limitations in the studies he relies upon because "all the studies of the health effects of oil spills on humans add to the *weight of evidence*."  ECF Doc. 513-2 at 9 (emphasis added).  As this Court explained in *In re Abilify*, a "weight of the evidence approach to analyzing causation can be considered reliable, provided the expert considers all available evidence carefully and explains how the relative weight of the various pieces of evidence led to his conclusion."  299 F. Supp. 3d at 1311 (citation and internal quotation marks omitted).  To use the method, an expert must "(1) identify an association between an exposure and a disease, (2) consider a range of plausible explanations for the association, (3) rank the rival explanations according to their plausibility, (4) seek additional evidence to separate the more plausible from the less plausible explanations, (5) consider all of the relevant available evidence, and (6) integrate the evidence using professional

judgment to come to a conclusion about the best explanation." *Id.* Dr. Carpenter, however, has not engaged in any such analysis.

As stated above, Dr. Carpenter admitted there are no-peer reviewed studies showing an association between exposure to weathered oil and chronic conjunctivitis. His 9-page report is devoid of any indication he considered other plausible explanations or that he considered all relevant available evidence. Also, despite Plaintiffs arguing Dr. Carpenter's "causation conclusions [are] based on the total weight of the evidence because no particular Hill criterion is dispositive or probative," ECF Doc. 513 at 27, Dr. Carpenter's report is devoid of an analysis of *any* Bradford Hill factors.

Based on the reasons set forth above, the undersigned finds Dr. Carpenter should be excluded as an expert on general causation.

### C.   Dr. Michael Freeman

Dr. Michael Freeman is a consultant in the fields of forensic medicine and forensic epidemiology. ECF Doc. 469-1 at 3. He works as a professor at multiple universities, has an extensive publication history, has served as an editor of peer-reviewed journals, and has provided testimony in civil and criminal trials in multiple jurisdictions. ECF Doc. 469-1 at 3-4. Dr. Freeman authored two expert reports in this case — one regarding chronic rhinosinusitis for Plaintiffs Jenkins and Siples,

ECF Doc. 469-1, and one regarding chronic conjunctivitis for Plaintiffs Davenport and Moulder, ECF Doc. 469-2.

In Dr. Freeman's reports, he concludes "[t]he results of [his] critical review of the relevant scientific and epidemiologic evidence support a general causal relationship between occupational exposure to chemicals associated [with] the BP Deepwater Horizon oil spill" and subsequent chronic rhinosinusitis, chronic conjunctivitis, and dry eye.  ECF Docs. 469-1 at 24; 469-2 at 27.  Dr. Freeman believes: (1) "[b]ased upon the adjusted hazard ratio for chronic sinusitis associated with crude oil inhalation, there is a minimum additional 55% risk attributable to the exposure, among those who have been exposed and have the condition"; and (2) "[t]he evidence indicates an association of [at] least a 24% increased risk in the general population of exposed workers" for chronic conjunctivitis.  *Id*.  BP seeks to exclude Dr. Freeman's opinions, arguing (1) he does not provide a dose level at which an exposure to any particular chemical or mixture of chemicals can cause chronic rhinosinusitis or conjunctivitis; (2) he ignored or misapplied the three indispensable methodologies; and (3) his methodology is flawed and unreliable.

After reviewing the evidence presented by the parties, including BP's motion, ECF Doc. 469, Dr. Freeman's reports, ECF Docs. 469-1, 469-2, Dr. Freeman's deposition testimony, ECF Doc. 469-3, and Plaintiff's opposition, ECF Doc. 512, the undersigned agrees with BP that Dr. Freeman's general causation opinions

should be excluded as being unreliable and unhelpful.  The undersigned also agrees with BP that Dr. Freeman's supplemental report should be stricken.

### 1. Failure to Identify a Harmful Dose or Specific Chemical

As with Dr. Carpenter's opinions, Dr. Freeman's general causation opinions fail to identify a particular chemical or mixture of chemicals capable of causing Plaintiffs' LMPCs.[28]  Instead, his reports refer only generally to "chemicals associated" with the DWH oil spill.  Such a failure is problematic, as not all workers had the same types of exposures and the available epidemiological studies do not all address the same exposure scenario.  Furthermore, the crude oil emitted from the wellhead underwent weathering as it traveled to the shore, which changed its chemical composition.  Dr. Freeman acknowledged as much in his report, as he noted volatile organic compounds found in crude oil evaporate within hours of reaching the water's surface.  ECF Doc. 469-1 at 13.  As stated above, *supra* Section V.B.2., other BELO courts have excluded the opinion of plaintiffs' expert, Dr. Cook, as being unhelpful for failing to "link any specific chemical that [plaintiff] was allegedly exposed to . . . to the conditions that he alleges in his complaint."  *See, e.g.*, *Wade*, 2022 WL 4448232, at *8.

---

[28] Dr. Freeman testified he did not attempt to identify the specific chemical or chemicals that caused the LMPCs and he was leaving that to the toxicological and environmental hygiene experts. M. Freeman Depo., at 54:19-25, 55:1-3.

And like Plaintiffs' other general causation experts, Dr. Freeman does not describe a threshold dose of a chemical which is capable of causing Plaintiffs' LMPCs.  This latter failure is fatal to the admissibility of his opinion, as caselaw requires Plaintiffs to present at least a threshold range of exposure which is considered capable of causing their chronic conditions.  *Cf. In re: Zantac*, 2022 WL 17480906, at *17 ("Courts universally reject general causation theories based upon the idea that *any* amount of a carcinogen, no matter how small, is actionable because an infinitesimal risk can neither be proven nor disproven.  Thus, since an actionable exposure threshold dose cannot, as a matter of law, be merely *anything*, that means it must be *something provable*."); *see also Seaman v. Seacor Marine, LLC*, 326 F. App'x 721, 726 (5th Cir. 2009) (finding expert did not establish general causation because she provided "no clue regarding what would be a harmful level of Ferox exposure").

### 2. Failure to Identify a Reliable Association in the Epidemiological Studies

To support his claim that "abundant evidence" supports statistically significant associations between exposure to "products" of the DWH Spill and chronic rhinosinusitis, Dr. Freeman cites his analysis of data collected by the National Institute for Occupational Safety and Health ("NIOSH"), the D'Andrea 2018 study, and the Rusiecki 2022 study.

At the request of BP, NIOSH performed a health hazard evaluation ("HHE") of DWH onshore response workers.  ECF Doc. 469-1 at 14.  The HHE involved observing working conditions and conducting surveys of workers regarding their exposures and symptoms.  *Id.*  Dr. Freeman says his analysis of the NIOSH data showed 18% of shoreline workers reporting any exposure to dripping oil, tar balls, dispersant, or dust reported sinus problems, while 4.7% of those reporting no such exposure reported sinus problems.  ECF Doc. 469-1 at 22.

But Dr. Freeman's use of the NIOSH data was flawed in several fatal respects. First, the NIOSH HHE was a cross-sectional study.  M. Freeman Depo., at 164:7-9 (stating the NIOSH report "is a cross-sectional study, in that it's looking for the prevalence of certain conditions in -- in groups").  Participants reported information regarding their exposure and health symptoms during the cleanup by completing a single survey.  Cross-sectional studies "are rarely useful in identifying toxic agents." Ref. Man. at 556.  And the authors of the HHE report expressly stated the goals of the HHE assessments "were to describe acute health effects" and "were not intended to describe or investigate potential long-term or chronic health effects."[29]   M. Freeman Depo., at 139:20-25, 140:1-2.  Despite these red flags, Dr. Freeman used the report and data to conclude a "product" of the DWH Spill can cause a *chronic*

---

[29] Similarly, the NIOSH HHE Interim Report 7 indicated "[t]he survey was not specifically designed for determinations of the cause(s) of reported health conditions."

condition.  *See In re Accutane Prods. Liab.*, 2009 WL 2496444, at *2 (M.D. Fla. Aug. 11, 2009) ("[W]hen an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study.").

Plaintiffs argue Dr. Freeman's reliance on studies regarding acute effects is permissible, claiming "[a]ll chronic illnesses started as acute illnesses."  ECF Doc. 512 at 16.  While that claim may be true, as stated above, *supra,* Section V.B.3., not all acute illnesses develop into chronic ones, as symptoms may resolve on their own or cease when exposure to an irritant ends.[30]  Thus, as with Dr. Carpenter, Dr. Freeman's failure to offer a reasonable explanation for how or why surveys about acute symptoms can be used to demonstrate an association between exposure and the development of chronic sinusitis and conjunctivitis undermines the reliability of his methodology.[31]  *See McClain*, 401 F.3d at 1242 (noting that one of the criteria

---

[30] In his declaration, Dr. Freeman states: "[T]he larger the subpopulation with acute symptoms (*e.g.,* 30% in the group with greater exposure versus 10% in a group with lesser exposure), the higher the risk of chronic illness diagnosis in the group with the higher frequency of acute symptoms.  Thus, although not an exact measurement of the risk of chronic illness diagnosis, the frequency of acute symptoms in an exposed population is a proxy for the risk of the chronic disease which is stable across populations (*i.e.,* there is no reason to believe that acute symptoms convert to chronic disease at a different rate in the 10% versus 30% acute symptoms groups from the above example)."  ECF Doc. 512-1 at 12.  This reasoning is simply too speculative, as Dr. Freeman admits the probability that acute symptoms will develop into a chronic condition is "unknown" and it is possible acute symptoms arising from a particular exposure or scenario may develop into a chronic condition at a different rate than a different exposure or scenario.

[31] In his deposition, Dr. Freeman suggested an extrapolation for chronic conjunctivitis was reasonable because the NIOSH survey participants had reported experiencing symptoms for more than four weeks.  M. Freeman Depo., p. 150:20-25, 151:1-2.  However, he then admitted the data did not indicate the participants had symptoms for any length of time.  M. Freeman Depo. P. 152:2-11.  Indeed, the survey form only asked workers, "During oil spill clean-up have you had any of the following symptoms?"  ECF Doc. 512-1 at 23.

for proving causation is "the toxic substance in question must have been demonstrated to cause *the type of illness or disease in question*") (emphasis added) (quoting David Eaton, *Scientific Judgment and Toxic Torts—A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & POL'Y 1, 38 (2003)).

Other features of the NIOSH data weaken its ability to support a general causation opinion in this case. Because the data was derived from survey responses, it was based on workers' self-reported exposures and symptoms and not verified through other means. Self-reports have the potential to introduce inaccurate information into a study and skew the results. *Cf.* Ref. Man. at 585 (Research has shown that individuals with disease (cases) tend to recall past exposures more readily than individuals with no disease (controls); this creates a potential for bias called recall bias.") (footnote omitted). Considering all of these limitations, the NIOSH data does not provide reliable support for Dr. Freeman's general causation opinion. *See* ECF Doc. 469-6 at 51 (Dr. Alexander notes the NIOSH data is self-reported "using a cross-sectional design with no statistical adjustments for confounding factors" and Dr. Freeman's analysis of it "provides no reliable or credible evidence to determine risk of chronic symptoms or conditions.").

Dr. Freeman's reliance on the Rusiecki 2022 study is also problematic. Dr. Freeman uses the 1.55 adjusted hazard ratio the Rusiecki study found between crude oil inhalation and chronic sinusitis, before smokers were removed, to conclude

"there is a minimum additional 55% risk attributable to the exposure[.]"  ECF Doc. 512-1 at 5.  However, as with Dr. Solomon's reports, Dr. Freeman's reports fail to acknowledge or grapple with the inherent inconsistencies among the results for the subgroups, *see supra,* Section V.A.2.  *See In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*, 176 F. Supp. 3d 483, 493 (E.D. Pa. 2016) ("[W]hen epidemiological studies are equivocal or inconsistent with a causation opinion, experts asserting causation opinions must thoroughly analyze the strengths and weaknesses of the epidemiological research and explain why that body of research does not contradict or undermine their opinion.").  Furthermore, Dr. Freeman's general causation opinion was not limited to the association identified in the Rusiecki study between crude oil inhalation and chronic sinusitis.  Instead, he offered a much broader opinion indicating there was "a general causal relationship between occupational exposure to chemicals associated [with] the BP Deepwater Horizon oil spill" and subsequent chronic rhinosinusitis.  ECF Doc. 469-1 at 24.

In his deposition, Dr. Freeman stated he disregarded the analyses in the Rusiecki study which did not show a statistically significant association between exposure and chronic sinusitis because he believed crude oil inhalation was a "more sensitive measure of really being around crude oil."  M. Freeman Depo., at 246:8-16.  This explanation shows the significance of Dr. Freeman's failure to identify a harmful level of exposure and casts additional doubt on his reliance on the NIOSH

data, as the NIOSH survey asked only generally about the frequency of exposure and did not ask the "more sensitive measure" about crude oil inhalation. *See* ECF Docs. 469-1 at 22; 469-2 at 26 (Dr. Freeman relies on NIOSH data regarding shoreline workers reporting *any exposure* to dripping oil, tar balls, dispersant, or dust to support the existence of an association with chronic sinusitis and conjunctivitis). In other words, it does not make sense for Dr. Freeman to ignore the analyses in Rusiecki that examined exposure generally, but then rely on similar analyses in the NIOSH data, D'Andrea 2018 study, and McGowan study to support his general causation opinions.

Furthermore, Dr. Freeman did not know, nor did he attempt to learn, whether the Coast Guard members in the Rusiecki study performed the same type of work as Plaintiffs or would have suffered comparable exposures. M. Freeman Depo., at 250:25, 251:1-4. In effect, Dr. Freeman cherry picked a favorable analysis from the Rusiecki study, while disregarding the analyses which undermined his ultimate opinion on general causation. Such a practice does not constitute a reliable method. *See In re Lipitor*, 174 F. Supp. 3d at 931 ("[C]herry-picking of data is unreliable and 'fails to satisfy the scientific method and *Daubert*.'") (quoting *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001)).

Dr. Freeman also cited the D'Andrea 2018 study (a followup to the 2013 study) in his assessment of the strength of association between exposure and chronic

rhinosinusitis.  Like Dr. Carpenter, Dr. Freeman acknowledged the study suffers from selection bias, but failed to address this limitation in his report.  M. Freeman Depo., at 110:9-1 ("So everybody who's in a compensation program reports symptoms more often than people who aren't in a compensation program.").  The study suffered from other limitations as well.  For example, only 44 of the 117 workers who participated in the initial study elected to participate in the follow-up study.  The authors recognized this "limited sample size may have influenced the statistics of the study."  M. Freeman Depo., at 209:17-18.  And although the study asserted that 91% of the exposed group had developed chronic rhinosinusitis at the follow-up, it did not compare that figure to the percentage of the unexposed group that had chronic rhinosinusitis.  M. Freeman Depo., at 211:1-10.  Without such a comparison, a relative risk cannot be determined; thus, it is unclear why Dr. Freeman would use the D'Andrea study to suggest a strong association exists between exposure and chronic sinusitis.  *See* Ref. Man. at 602 ("Relative risk measures the strength of the association.").  The flaws in the D'Andrea study indicate it cannot be used as part of a reliable method for arriving at a general causation opinion, particularly where the expert fails to engage in any meaningful critique of the study and its impact on the expert's ultimate conclusion.

In his chronic conjunctivitis report, Dr. Freeman relies on the NIOSH data and the McGowan 2017 study to support the existence of an association between that

condition and exposure.  However, he admitted that none of the DWH studies he "reviewed specifically mentioned chronic conjunctivitis as a health condition that they were reporting on."   M. Freeman Depo., at 313:5-9.   Furthermore, the McGowan study, like the NIOSH data, addressed symptoms and not the diagnosed chronic conditions at issue here.[32]  The authors of the McGowan study also indicated "[t]he exposure measures used in this analysis were based on self-reported responses to questions about work locations and dispersant-related tasks and do not allow exploration of exposure-response relationships."   ECF Doc. 469-5 at 108.   Most importantly, McGowan's eye irritation analysis studied individuals who worked directly with or around dispersants.[33]  But Plaintiffs Davenport and Moulder did not perform such work with dispersants, NIOSH investigators found "no evidence of exposure to dispersant" at onshore worksites, ECF Doc. 469-1 at 22, and Dr. Freeman agreed that persons that worked on land would not have been exposed to dispersants, M. Freeman Depo., at 219:2-7.  *See also* M. Freeman Depo., at 52:19-

---

[32] The workers examined by the McGowan study did report their symptoms both at the time of the cleanup and at the time of study enrollment, which was one to three years after the cleanup.

[33] McGowan indicated: "For respiratory and eye irritation analyses, dispersant exposure for workers was classified as 'ever/never' based on a positive response to any interview question asking about direct work with dispersants or work on a ship from which dispersants were applied (see Table S1).  Additionally, participants were classified as exposed if they responded positively to working on any task that involved dispersant-related equipment, such as pumps, for more than half of the time."  McGowan CJ, Kwok RK, Engel LS, Stenzel MR, Stewart PA, Sandler DP. Respiratory, Dermal, and Eye Irritation Symptoms Associated with Corexit™ EC9527A/EC9500A following the *Deepwater Horizon* Oil Spill: Findings from the GuLF STUDY. Environ Health Perspect. 2017 Sep 15;125(9):097015. doi: 10.1289/EHP1677. PMID: 28934097; PMCID: PMC5915187.

22 (testifying it was his understanding that dispersants were "dropped out around where the spill and the slick was, so it would have been a ways off of the . . . shore"). Because McGowan evaluated a dissimilar group of workers who did not have the same exposures as Plaintiffs, the study is not a good "fit" for the facts of this case and does not support an opinion that the chemicals Plaintiffs were exposed to could cause chronic conjunctivitis.[34]  *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *15 ("As with reliability, there is 'no fit' if a large analytical leap must be made between the facts and the opinion.") (quotation omitted).

Dr. Freeman's chronic conjunctivitis report also references studies about different oil spills or oil exposures but fails to adequately explain their relevance to his own analysis.  He cites to several of the same studies as Dr. Carpenter, such as the ones by Na and Kim of the *Hebei Spirit* oil spill off the coast of the South Korea. ECF Doc. 469-2 at 23-24.  However, he testified he did not know whether the chemical composition of the oil involved in that spill was similar to the DWH Spill, M. Freeman Depo., at 266:1-4, and did not know what types of cleanup activities the persons in the study performed, M. Freeman Depo., at 267:18-21.  He also testified it did not matter to his assessment of general causation that the *Hebei Spirit* spill occurred only 5 miles offshore, while the DWH spill occurred over 100 miles

---

[34] The distinct exposures suffered by Plaintiffs and the McGowan study participants highlights the problems associated with Dr. Freeman's failure to identify a particular chemical or mixture of chemicals which he believes can cause the LMPCs.

offshore, M. Freeman Depo., at 266:9-24, which ignores the effect weathering has on oil's composition. *See* ECF Doc. 469-7 at 13 ("The chemical composition changed as the oil took approximately one hour to rise through one-mile of ocean water and then changed further as the oil took approximately six weeks to travel 125-180 miles to reach the Florida Coast.").

Dr. Freeman also cites two studies referred to by Dr. Carpenter regarding oil exposure in Nigeria. However, the Awoyesuku study was a cross-sectional study that did not include a comparison with a control population that would permit assessment of the relative risk between exposed and unexposed individuals. M. Freeman Depo., at 278:11-25, 279:1-2. The Omoti study evaluated workers in the petroleum refining industry, and Dr. Freeman admitted those workers would have been exposed to different chemicals than DWH shore workers. M. Freeman Depo., at 282:4-25, 283:1-25, 284:1-4. Because the exposure scenarios in these studies differed from those of Plaintiffs, the studies are not relevant or helpful to formulating a general causation opinion. *Cf. Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 353 (5th Cir. 2007) ("Knight, who worked as a tankerman for only one year, does not allege the type of exposure, either in terms of the chemicals involved or the length of exposure, experienced by 'shipyard workers' in the Olsson study. Thus, the Olsson study does not appear to be very relevant to Knight's claim.").

Based on the foregoing, Dr. Freeman failed to meet the first step for relying on epidemiological data – that is, he failed to identify a reliable statistical association between exposure and chronic sinusitis or conjunctivitis in the epidemiological literature.  He also failed to meet the second step.

### 3.  Failure to Reliably Apply the Bradford Hill Factors

Both of Dr. Freeman's reports contain sections devoted to consideration of the Bradford Hill factors.  However, his analysis of the Bradford Hill factors is cursory and superficial.  In the "Consistency" section of his chronic rhinosinusitis report, Dr. Freeman states "[i]n addition to demonstrating strength of association, the [NIOSH data, the D'Andrea 2018 study, and the Rusiecki 2022 study] demonstrate consistent associations between exposure to products of the BPDWH oil spill and sinusitis or chronic rhinosinusitis."  ECF Doc. 469-1 at 22.  However, those three studies did not examine the same exposure-disease relationship.  *See* Ref. Man. at 604 ("Different studies that examine the same exposure-disease relationship generally should yield similar results.").  As discussed above, the NIOSH data involved acute symptoms while the other two studies involved chronic sinusitis. Similarly, Dr. Freeman relied on the Rusiecki study for its findings based on crude oil inhalation, while the other two studies included additional exposure scenarios. And within the Rusiecki study itself, the analyses of different types of exposure did not show consistent associations.  Thus, Dr. Freeman's explanation of the

consistency factor is misplaced and indicates he did not reliably apply the Bradford Hill criteria.

The "coherence" section of Dr. Freeman's chronic rhinosinusitis report provides an example of cursory nature of some of his Bradford Hill analysis. That section contains a single sentence stating: "It certainly 'makes sense' that exposure to inhaled irritants can cause acute and chronic upper respiratory illnesses." ECF Doc. 469-1 at 23. Likewise, he claims "[t]he chain of causation between the acute and chronic symptoms in the populations studied over time is clearly established, and contiguous." ECF Doc. 469-1 at 23. However, his report offers no explanation for this claim.

In the "biological gradient" section of Dr. Freeman's reports, he asserts his analysis of the NIOSH data revealed significant dose-response relationships between the frequency of exposure to: (1) both solid tar balls and dust and self-reported nose irritation, sinus problems, or sore throat; and (2) solid tar balls and self-reported eye redness or itching. ECF Docs. 469-1 at 23; 469-2 at 26. However, this analysis does not address the dose-response relationship between exposure and chronic sinusitis or conjunctivitis because, as discussed above, the NIOSH data concerned only symptoms and Dr. Freeman has not provided reasonable basis for using symptoms as a proxy for chronic conditions. This analysis does not represent a reliable application of the Bradford Hill factors.

### 4.  Dr. Freeman's Supplemental Declaration

In response to BP's motion, Dr. Freeman submitted a declaration with an attached supplemental report.  ECF Doc. 512-1.  The supplemental report was created after Dr. Freeman submitted Freedom of Information Act requests in March and April 2022 to obtain NIOSH's full dataset and an additional NIOSH survey form.  ECF Doc. 512-1 at 17.  Using this additional information, Dr. Freeman concluded: (1) a dose-response relationship was observed for exposure duration, i.e., "sinus and ocular symptoms were reported more often with increasing duration of employment"; (2) "symptoms were also reported more often with increasing frequency of exposure to tar balls, dust, dripping oil, and dispersants."  ECF Doc. 512-1 at 18.  Specifically, Dr. Freeman concluded: (1) "each 30-day increase in the duration of employment was associated with a 43% increase in the odds of *sinus* symptoms"; (2) "each level increase in the frequency of exposure to tar balls (from not at all *to* a few days *to* almost every day *to* daily) was associated with a 27% increase in the odds of *sinus* symptoms; for dust the increase was 38% per level"; (3) "each 30-day increase in the duration of employment was associated with a 41% increase in the odds of *ocular* symptoms"; and (4) "each level increase in the frequency of exposure to tar balls was associated with a 28% increase in the odds of *ocular* symptoms; for dust the increase was 47% per level."  ECF Doc. 512-1 at 21.  Based on the foregoing, Dr. Freeman believed "exposures to oil spill-associated

irritants during [Plaintiffs'] response work were a substantial factor in causing their chronic conditions." ECF Doc. 512-1 at 22.

Dr. Freeman states the "results of [his] updated analyses demonstrate statistically significant dose-response relationships between the number of days worked in BPDWH onshore clean-up and sinus and ocular symptoms. In addition, significant dose-response relationships were found between the frequency with which workers were exposed to tar balls, dust, dispersants, and dripping oil and these symptoms." ECF Doc. 512-1 at 16.

BP has moved to strike Dr. Freeman's declaration and supplemental report, arguing they are untimely and contain new opinions and analysis. ECF Doc. 527. Under Fed. R. Civ. P. 26(a)(2)(A), "a party must disclose to the other parties the identity of any witnesses it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." These disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(C). Compliance with Rule 26 "is not merely aspirational." *Cooper v. Southern Co.,* 390 F.3d 695, 728 (11th Cir. 2004) (internal citation omitted), *overruled in part on other grounds,* 126 S. Ct. 1195 (2006). Compliance is necessary to allow "both sides in a case to prepare their cases adequately and to prevent surprise." *Id*.

A party who fails to comply with Rule 26 may be prohibited from using the identified witness at trial "unless the failure was *substantially justified* or is

*harmless*." Fed. R. Civ. P. 37(c)(1) (emphasis added). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the non-disclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (citing *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)).

"Courts enjoy broad discretion under Rule 37(c)(1) to exclude evidence." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2021 WL 763778, at *2 (N.D. Fla. Jan. 15, 2021) (quoting *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 718 (11th Cir. 2019) (noting that appellate courts review a district court's exclusion of evidence based on an abuse of discretion)). In exercising that discretion, courts generally consider the following four (4) factors: "(1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *See id.* (citing *Howe v. City of Akron,* 801 F.3d 718, 747 (6th Cir. 2015)); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003). Considering those factors here, the Court finds BP's motion to strike should be granted to the extent Dr. Freeman's supplemental report, and the portions of his declaration which reference the supplemental report, should be stricken.

Dr. Freeman's declaration and supplemental report clearly contain new opinions and did not merely clarify opinions offered in the initial reports.[35]   The supplemental report contains new analyses of NIOSH data and new conclusions regarding dose-response relationships based on exposure duration and frequency. ECF Doc. 512-1 at 15-29.

Plaintiffs, however, have offered no real justification for the untimeliness of the supplemental report.  Dr. Freeman submitted his FOIA requests for the additional NIOSH data in March and April 2022, *after* his February 2022 deposition.  Based on this timing, it appears the requests may have been precipitated by BP's questions at the deposition.  Regardless, Plaintiffs failed to provide any justification for the delay in seeking the additional information.  Dr. Freeman could have easily done it at any time after he was retained.  Moreover, at no point did Plaintiffs inform BP Dr. Freeman was writing a supplemental report or performing an analysis of newly acquired (but previously available) data.  Instead, on September 13, 2022, Plaintiffs surprised BP with Dr. Freeman's declaration and supplemental report in their response to BP's *Daubert* motion.  This untimely disclosure deprived BP of the opportunity to question Dr. Freeman regarding the analysis contained in the

---

[35] Although Plaintiffs' response to BP's motion to strike asserts Dr. Freeman's declaration and supplemental report "do not seek to change his opinions or add new ones," ECF Doc. 535 at 2, at oral argument Plaintiffs' counsel admitted Dr. Freeman's analysis of the dose-response relationship in terms of duration of exposure was a new opinion.

supplemental report and prevented BP's expert from formulating a rebuttal. Although Plaintiffs suggest any prejudice could be cured by reopening discovery or allowing BP to file a reply, the undersigned finds such actions would unnecessarily delay the progression of this case.  Indeed, the supplemental report was filed within weeks of the Court setting this matter for oral argument; Plaintiffs' conduct warrants the exclusion of the supplemental report.

Accordingly, BP's motion to strike should be granted to the extent Dr. Freeman's entire supplemental report (ECF Doc. 512-1 at 15-29) should be stricken. In addition, the portions of Dr. Freeman's declaration which refer to the analysis contained in the supplemental report should also be stricken.   However, the undersigned finds the portions of Dr. Freeman's which do not reference the supplemental report and instead merely attempt to explain the methodology he used to formulate his original reports should not be stricken.

Regardless, even assuming Dr. Freeman's supplemental report and the associated portions of his declaration should not be stricken, they do not render his general causation opinion reliable and helpful.   First, because Dr. Freeman's "updated" analysis is based on the NIOSH data, it still suffers from the same problems identified above (e.g., it provides information only on self-reported exposures and symptoms, not the diagnosed chronic conditions alleged by Plaintiffs).   Second, Dr. Freeman's analysis of the dose-response relationship and

identification of a harmful dose in terms of days is still flawed in that it does not include consideration of the amount of exposure.  As discussed above in regard to Dr. Solomon's opinion, a dose level based on duration without an accompanying level is simply not helpful.  Thus, even if the Court were to consider Dr. Freeman's supplemental report as being timely, it would still not make his general causation opinions admissible.

In sum, Dr. Freeman fails to identify a harmful dose of any particular chemical or mixture of chemicals, and the studies he relied on, and his use of those studies, do not provide an adequate basis for his general causation opinion.  Thus, Dr. Freeman's opinions should be excluded.

## D.    Dr. Ranajit Sahu[36]

Ranajit Sahu, Ph.D., is a mechanical engineer who provides consulting services in environmental, energy, and engineering matters.  ECF Doc. 459-1 at 14. Relying on the actual sampling data for the DWH Spill and affidavits from the Plaintiffs, Dr. Sahu offers the following opinions:

- Oil and related materials, including dispersants, resulting from the Deepwater Horizon blowout reached the Florida Coast;

- Plaintiffs were deployed to the locations where oil had arrived either on beaches, in the water along the shoreline, or in the adjacent Gulf waters;

---

[36] The parties agreed the Court could decide the motion to exclude Dr. Sahu without oral argument.

- Plaintiffs were given various work tasks, generally involving cleaning the oil from the impacted areas on land and/or water, or in some cases had support functions such as boat captains or equipment maintenance workers, etc.

- In all instances, there were multiple opportunities for Plaintiffs (i.e., any Plaintiff in the class) to be exposed to a wide range of oil-spill related CoCs[37] via one or more pathways such as inhalation, dermal contact, or ingestion.

- Any PPE that was provided or used did not prevent such exposures to the point of cutting-off one or more pathways.  Thus, exposure pathways were present regardless of PPE.

ECF Doc. 459-2 at 85.

BP argues Dr. Sahu's opinions should be excluded because they are not relevant or helpful to the trier of fact.  ECF Doc. 459.  Specifically, BP argues Dr. Sahu's opinions do not identify the exposure levels of any chemical or chemicals that could have caused Plaintiffs' alleged LMPCs. *Id.* at 8–9.  Plaintiffs admit they did not retain Dr. Sahu to provide an opinion on medical causation.  ECF Doc. 491 at 3.  They argue, however, that Dr. Sahu's opinions nonetheless meet *Daubert* muster as to general causation because Dr. Sahu reviewed the actual exposure data for the DWH Spill, which Dr. Williams did not do, and identified the chemicals and levels of those chemicals to which Plaintiffs were exposed.  *See id.* at 9–10. Identifying all the chemicals and levels of exposure without any determination as to

---

[37] "CoCs" are contaminants of concern, which according to Dr. Sahu, are all substances any of the Plaintiffs "were exposed to or could potentially have been exposed to."  Sahu Depo., at 17:1–6.

which chemical(s) could have caused the complained of LMPCs, and at what level, however, does not meet the threshold requirements for establishing general causation. Thus, after reviewing the voluminous evidence presented by the parties, including BP's motion, ECF Doc. 459, Plaintiffs' response, ECF Doc. 491, including the supplemental declaration of Dr. Sahu, ECF Doc. 491-1, and Dr. Sahu's deposition, ECF Doc. 459-2, the undersigned recommends Dr. Sahu's opinions be excluded.

As stated above, "[g]eneral causation is whether a substance is capable of causing a particular injury or condition in the general population." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 387 F. Supp. 3d 323, 336 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 113 (2d Cir. 2020). Dr. Sahu's opinions, however, do not speak to general causation. Nowhere in Dr. Sahu's report does he identify whether any of the CoCs were capable of causing the type of harm alleged by Plaintiffs or at what levels. Dr. Sahu admits he is "not offering expert opinions on whether exposure to any particular contaminant of concern caused any medical condition alleged by any plaintiff." R. Sahu Depo., at 20:23–25; 21: 1–2. Dr. Sahu admits no "actual levels" of CoCs are shown in his report; instead, the report "just shows the names of the various CoCs." *Id.* at 34:11-15.[38] Dr. Sahu's report does

---

[38] Dr. Sahu does not know if any of the sampling results he reviewed indicate that CoCs exceeded any occupational exposure limit, EPA or OSHA regulatory limit, permissive exposure limit, or

not identify any specific health effects that are supposedly caused by any of the CoCs he identifies. *Id.* at 172:18–24; 220:3–13.  While Plaintiffs are correct that a general causation expert does not need to determine the "precise level of exposure," *see* ECF Doc. 491 at 9, Dr. Sahu has not provided *any* toxic level of exposure. *See, e.g.*, *Zantac*, 2022 WL 17480906, at \*17 (agreeing that a "threshold range" would satisfy Eleventh Circuit case law).  Dr. Sahu's report merely provides a listing of the numerous chemicals released by the oil spill and an opinion that Plaintiffs could have been exposed to those chemicals.  ECF Doc. 459-1 at 22, 24–28; R. Sahu Depo., at 11: 4–12; 17:1–18.  This is not enough.

Moreover, Dr. Sahu did not utilize any of the three primary methodologies for determining general causation.  Dr. Sahu discusses no epidemiological studies and does not rely on epidemiology, other than as it relates to "routes of exposure."  R. Sahu Depo., at 12:9–17.  Dr. Sahu does not provide a dose-response assessment or a dose reconstruction.  *Id.* at 21:3–9.  Dr. Sahu discusses no background risk of disease.  Instead, Dr. Sahu described his methodology as "general," "pretty standard," and not "documented per se."  *Id.* at 81–82.  It consisted of reviewing affidavits and sampling data compiled by an analyst with No Pollution Enterprises, who was requested to search some databases for any contaminant of concern that

---

any other work protection or exposure protection limit.  R. Sahu Depo, at 34:6–9; 128: 4–25; 129:1–10.

was detected in any way in the databases and put those on a graph. *Id.* at 29–30, 33–35, 68–69. The "reconstruction" Dr. Sahu performed "was to see if the plaintiffs were working in the same area doing the kind of work they were doing and they would have had potential contact with oil and the chemicals of concern." *Id.* at 80:9–13. As Dr. Sahu explains, the "sum totality of the methodology" he used was "a forensic superposition of these different facts, looking at the data that was collected by others . . . and relying on the documents that [he] reviewed for the plaintiffs, that they were engaged, A, in cleanup and; B, in this stretch of the coast." *Id.* at 84:15–21.

Plaintiffs argue the Court should allow Dr. Sahu's opinions because they are relied upon by other experts. Plaintiffs, however, do not identify which experts rely on Dr. Sahu's work or opinions. Regardless, since Dr. Sahu merely relied on sampling data and the Plaintiffs' affidavits to reach his opinions, the other experts could have done the same. Also, while Dr. Sahu's opinion may remedy the concern the Court had with Dr. Williams' opinion, which did not include an analysis of the actual exposure data collected in the relevant geographical area or determine whether Plaintiffs were potentially exposed, it does not meet the minimum standard of connecting any level of, or any CoC, for that matter, to the harm alleged.[39]

---

[39] In Dr. Sahu's Declaration, he specifically states that he was attempting to remedy this complaint by BP. ECF Doc. 491-1 at 3.

Plaintiffs also argue BP is conflating general causation with specific causation by requiring Dr. Sahu to provide an opinion regarding Plaintiffs' alleged exposures. The Court agrees the degree of exposure suffered by Plaintiffs is not an issue to be addressed on general causation.   Nonetheless, Dr. Sahu's opinions, which are "limited to identifying potential exposures of the plaintiffs to contaminants of concern," R. Sahu Depo., at 22:13–16, simply do not establish general causation. *See McClain*, 401 F.3d at 1241–42.   Dr. Sahu's opinions do not have a "valid scientific connection to the pertinent inquiry" of whether levels of any CoC existed at the Florida Gulf Coast which could cause the type of harm alleged by Plaintiffs. *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (quoting *Daubert*, 509 U.S. at 591–92) (internal quotation marks omitted).   Thus, the undersigned agrees with BP – Dr. Sahu's opinions are irrelevant and unhelpful.

## VI.    MOTION FOR SUMMARY JUDGMENT

As stated above, Federal Rule of Civil Procedure 56 requires a court to grant summary judgment for a moving party when the party proves that there is no genuine dispute of material fact and that the party is entitled to judgment as a matter of law. In a toxic tort case, the plaintiff must have admissible primary evidence with which to establish general causation.  *See Chapman*, 766 F.3d at 1308, 1316.  Because the undersigned finds Plaintiffs' general causation experts should be excluded, Plaintiffs

do not have evidence to create genuine dispute of material fact. Thus, the undersigned recommends the motion for summary judgment be granted.

Accordingly, it is ORDERED:

1.     The clerk shall terminate BP's *Daubert* motion to exclude the opinions of Dr. James J.J. Clark, ECF Doc. 460, as MOOT, based on Plaintiffs' withdrawal of Dr. Clark as an expert on general causation. The clerk shall also terminate as MOOT, BP's related motion to strike the supplemental declaration of Dr. Clark, ECF Doc. 525.

2.     The clerk shall terminate BP's *Daubert* motion to exclude the opinions of Dr. Robert Cykiert on diagnosis, ECF Doc. 462, as MOOT, given the undersigned's finding that Plaintiffs' general causation experts should be excluded and judgment entered in favor of BP.

3.     The clerk shall terminate BP's *Daubert* motion to exclude the opinions of Dr. David Greene on diagnosis, ECF Doc. 467, as MOOT, given the undersigned's finding that Plaintiffs' general causation experts should be excluded and judgment entered in favor of BP.

4.     BP's motion to strike the second supplemental declaration of Dr. Gina Solomon, ECF Doc. 561, is DENIED.

5.     Plaintiffs' motion to strike BP's notice of supplemental authority, ECF Doc. 537, is DENIED.

6.      BP's motion to strike the supplemental declaration of Dr. Michael Freeman, ECF Doc. 527, is GRANTED to the extent set forth in this Order and Report and Recommendation.

It is further RECOMMENDED:

1.      BP's *Daubert* motion to exclude the opinions of Dr. Ranajit Sahu, ECF Doc. 459, be GRANTED.

2.      BP's *Daubert* motion to exclude the opinions of Dr. Gina Solomon, ECF Doc. 466, be GRANTED.

3.      BP's *Daubert* motion to exclude the opinions of Dr. David Carpenter, ECF Doc. 468, be GRANTED.

4.      BP's *Daubert* motion to exclude the opinions of Dr. Michael Freeman, ECF Doc. 469, be GRANTED.

5.      BP's motion for summary judgment, ECF Doc. 470, be GRANTED.

6.      Judgment be entered in favor of BP in these test cases as well as in all cases represented by the Downs Group in this Master Action, involving plaintiffs with the same LMPCs at issue in these test cases, which have been stayed.

At Pensacola, Florida, this 15th day of December 2022.

*s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**